# THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF INDIANA – LAFAYETTE DIVISION

| | | |
|---|---|---|
| JANE DOE, an individual, | ) | Case No.: 4:18-cv-00072-JVB-JEM |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S FIRST AMENDED** |
| | ) | **COMPLAINT FOR DAMAGES** |
| vs. | ) | |
| | ) | **1. Violation of Title IX, 20** |
| PURDUE UNIVERSITY, a public | ) | **U.S.C. § 1681;** |
| entity, and LANCE | ) | **2. Sexual Battery;** |
| DUERFAHRD, an individual, | ) | **3. Sexual Assault;** |
| | ) | **4. Intentional Infliction of** |
| Defendants. | ) | **Emotional Distress; and** |
| | ) | **5. Negligent Retention and** |
| | ) | **Supervision.** |
| | ) | |
| _____ | ) | **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

INTRODUCTION...................................................................................... 1

PARTIES ................................................................................................... 2

JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT ............ 3

STATEMENT OF FACTS .......................................................................... 4

    (I)    JANE DOE'S RIGHTS TO BE FREE FROM SEXUAL
           DISCRIMINATION IN HER EDUCATION ............................... 4

    (II)   PURDUE EXERCISED SUBSTANTIAL CONTROL OVER
           DUERFAHRD VIA ITS ANTI-HARASSMENT, SEXUAL
           HARASSMENT, AND AMOROUS RELATIONSHIP POLICIES................ 6

        (a)   *Purdue's Anti-Harassment Policy* ............................ 6

        (b)   *Purdue's Sexual Harassment Policy* ...................... 7

        (c)   *Purdue's Amorous Relationship Policy* .................. 8

        (d)   *Purdue's Strict Mandatory Reporting Requirements* ........... 8

        (e)   *Duerfahrd Was Subject to Discipline* .................... 9

    (III)  PURDUE POSSESSED KNOWLEDGE PRIOR TO SEPTEMBER 29,
           2016 THAT DUERFAHRD VIOLATED ITS POLICIES ........................ 9

    (IV)  DUERFAHRD'S SEXUAL HARASSMENT ESCALATED TO SEXUAL
           VIOLENCE AGAINST JANE DOE DEPRIVING HER OF
           EDUCATIONAL OPPORTUNITIES ..................................... 13

    (V)   PURDUE ACTED WITH DELIBERATE INDIFFERENCE IN FAILING
           TO DISCIPLINE DUERFAHRD PRIOR TO SEPTEMBER 29, 2016 ........ 23

    (VI)  PURDUE'S FAILURE TO DISCIPLINE DUERFAHRD MADE
           PLAINTIFF VULNERABLE TO HARASSMENT ..................... 24

    (VII) PURDUE PRESIDENT MITCHELL E. DANIELS RATIFIED
           DUERFAHRD'S ACTIONS ............................................. 24

FIRST CAUSE OF ACTION....................................................................... 25

SECOND CAUSE OF ACTION................................................................... 27

THIRD CAUSE OF ACTION ..................................................................... 28

FOURTH CAUSE OF ACTION .................................................................. 29

FIFTH CAUSE OF ACTION ...................................................................... 30

PRAYER FOR RELIEF.............................................................................. 31

DEMAND FOR JURY TRIAL.................................................................... 32

---

## COMPLAINT

COMES NOW plaintiff JANE DOE ("Plaintiff" or "Doe") and hereby alleges, based on information and belief, causes of action against defendants PURDUE UNIVERSITY ("Purdue", "University" or "Defendant") and LANCE DUERFAHRD ("Duerfahrd," "Defendant" or "Professor Duerfahrd") (sometimes collectively referred to as "Defendants"), and requests a jury trial as follows:

## INTRODUCTION

1.      Over 40 years ago, Congress enshrined in law, what has become colloquially known as "Title IX", establishing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

2.      Purdue's acts and omissions violated Plaintiff's right to be free from discrimination on the basis of her sex. Purdue knew for years that its tenured professor in its English Department, Lance Duerfahrd, continuously violated Purdue's own Anti-Harassment Policy, Sexual Harassment Policy, and Amorous Relationship Policy. Despite Purdue's knowledge that Duerfahrd was a sexual predator who sexually harassed and assaulted female students in his classes and within the English Department where he taught, Purdue intentionally, and with deliberate indifference, refused to discipline Duerfahrd.

3.      Purdue possessed actual knowledge of Professor Duerfahrd's sexual harassment/assault of female students since at least 2012, when Duerfahrd was awarded tenure. From that point on, it was clear to the University that Duerfahrd would continue to use his position to stalk and prey on young women in his classes. Like many other institutions of higher learning, Purdue looked the other way when it became aware Professor Duerfahrd was hunting female students. Purdue's deliberate indifference resulted in Duerfahrd continuing to sexually harass female students and culminated in the sexual harassment and assault of Plaintiff.

## PARTIES

4.      Plaintiff JANE DOE is a female who was enrolled as an undergraduate student at Purdue beginning in the fall of 2015 and was in Professor Duerfahrd's classes during the fall of 2016.

5.      Defendant PURDUE UNIVERSITY ("Purdue," "University" or "Defendant") is a state university, established under the laws of the State of Indiana.

6.      Defendant LANCE DUERFAHRD ("Duerfahrd," "Defendant" or "Professor Duerfahrd"), an individual, was a citizen of the State of Indiana, who resided in the County of Tippecanoe, Indiana. At all relevant times, he was

employed by Purdue, acting in his course and scope of employment, and Purdue ratified his actions. Duerfahrd now resides in Massachusetts.

7.     Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that the Defendants' officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendants, or was done in the routine normal course and scope of employment of the Defendants' officers, directors, vice-principals, agents, servants, or employees.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

8.     This action is brought under Title IX of the Education Act Amendments of 1972 (20 U.S.C. § 1681) and 42 U.S.C. § 1983. Plaintiff also presents pendent state law claims for sexual assault and battery, intentional infliction of emotional distress against Duerfahrd as well as state law claims for negligent retention/supervision against Purdue.

9.     Subject matter jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and § 1343(3) (civil rights). Plaintiff's state law claim for relief are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the wrongful conduct giving rise to this case occurred in the County of Tippecanoe, Indiana, which is located in the Northern District of Indiana. Defendants are, and at all relevant times were, citizens and residents of Tippecanoe County, Indiana, located in the Northern District of Indiana.

11.     Plaintiff provided timely notice, on or about February 14, 2017 to Purdue and the State of Indiana of the pendent state law claims, which were rejected and exhausted.

## STATEMENT OF FACTS

### (I)     JANE DOE'S RIGHTS TO BE FREE FROM SEXUAL DISCRIMINATION IN HER EDUCATION

12.     The term "Title IX" comes from Title IX of the Education Act of 1972, which provides in pertinent part that a person cannot "be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX was modeled after Title VI of the Civil Rights Act of 1964, which prohibits race discrimination in programs receiving federal funds. Universities, such as Purdue, that receive federal funding, agree not to permit discrimination based on sex in exchange for the funds. In exchange for those federal funds, Congress provided a private right of action for students who were discriminated against by their education entity.

13.     The Supreme Court has held that a private right of action for damages is available under Title IX for the sexual harassment of a student by a teacher/professor if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination in the recipient's program and fails to adequately respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) ("Gebser").

14.     There are five elements to a Title IX claim for sexual harassment, as expressed by the Supreme Court in *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd of Educ.*, 526 U.S. 629, 644 (1999) ("Davis"). First, the school must have "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[ed]." *Id.* at 645. Second, the school must have had "actual knowledge" of harassment by an official who "at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [university's] behalf." *Delgado v. Stegall,* 367 F.3d 688, 672 (7th Cir. 2004) (citing *Gebser*, *supra*, 524 U.S. at 290). Third, the plaintiff must suffer harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 655. Fourth, the university must have acted with "deliberate indifference," a standard greater than negligence. *Davis*, *supra*, 526 U.S. at 648.

The fifth element is causation. The plaintiff must show that the school's actions "cause[d] the plaintiff to undergo harassment or make [her] liable or vulnerable to it." *Id.* at 630.

**(II)** **PURDUE EXERCISED SUBSTANTIAL CONTROL OVER DUERFAHRD VIA ITS ANTI-HARASSMENT, SEXUAL HARASSMENT, AND AMOROUS RELATIONSHIP POLICIES**

15.     Purdue has established policies precluding harassment, sexual harassment and amorous relationships. At all times, these policies applied to Duerfahrd, who was subject to discipline. As explained below, Purdue knowingly failed to enforce its own policies against Professor Duerfahrd.

16.     Purdue's Anti-Harassment policy is found in its Ethics Policy, Chapter III.C.1. It claims that "[h]arassment in the workplace or the educational environment is unacceptable conduct and will not be tolerated."

**(a)** *Purdue's Anti-Harassment Policy*

17.     Purdue's Anti-Harassment policy defines harassment as "[c]onduct towards another person or identifiable group or persons" that has the purpose or effect of:

1.  Creating an intimidating or hostile educational environment, work environment or environment for participation in a University program or activity;

2.  Unreasonably interfering with a person's educational environment, work

environment or environment for participation in a University program or activity; or

3.  Unreasonably affecting a person's education or work opportunity or participation in a University program or activity.

Use of the term Harassment includes all forms of harassment, including "Stalking, Racial Harassment and Sexual Harassment."

**(b)  *Purdue's Sexual Harassment Policy***

18.    Purdue's Sexual Harassment Policy is further defined as: "(a) any act of Sexual Violence[1]; (b) Any act of sexual exploitation; (c) Any unwelcome sexual advance, request for sexual favors or other written, verbal or physical conduct of a sexual nature when: (1) [s]ubmission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, education or participation in a University activity; (2) [s]ubmission to, or rejection of, such conduct by an individual is used as the basis for, or a factor in, decisions affecting that individual's employment, education or participation in a University activity; or

---

[1]    Sexual Violence is further defined as: Any non-Consensual sexual act, including but not limited to rape, sexual assault, sexual battery and sexual coercion. Sexual Violence also includes <u>Relationship Violence</u>. Examples of Sexual Violence include, but are not limited to:

- Non-Consensual sexual contact: touching, with any body part or object, another person's intimate parts (e.g., genitalia, groin, breast, buttocks), whether clothed or unclothed.
- Non-Consensual sexual intercourse: oral, anal and/or vaginal penetration, to any degree and with any body part or object.
- Compelling a person to touch his or her own or another person's intimate parts without Consent.

(3) [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance or creating an intimidating, offensive or hostile environment for that individual's employment, education or participation in a University activity."

**(c)**   ***Purdue's Amorous Relationship Policy***

19.    Purdue, at all relevant times, had an expansive policy that strictly prohibited amorous relationships. It applies, not just between students and any University employee who has educational responsibility over the student, but also between supervisors and subordinates.

**(d)**   ***Purdue's Strict Mandatory Reporting Requirements***

20.    Purdue, at all relevant times, required that all "Mandatory Reporters" to "report all incidents of discrimination, harassment or retaliation." Mandatory Reporters includes individuals employed by the University who hold a title of or equivalent to President, Chancellor, vice president, vice chancellor, vice provost, dean, department head and director, as well as all faculty members, coaches, employees in supervisory or management roles, student affairs professionals, academic advisors and residential life staff. Also included are individuals who have authority and responsibility to remedy Harassment, or those whom a student would reasonably believe has such authority (e.g., Student Organization Advisors, including fraternities and sororities).

**(e)** **_Duerfahrd Was Subject to Discipline_**

21.　　Duerfahrd, as a tenured professor, was subject to discipline for failing to comply with Purdue's Anti-Harassment policy.

> "Any individual or group of individuals found to have violated this policy will be subject to disciplinary and/or remedial action, up to and including termination of employment or expulsion from the University. Faculty and staff who are determined to have violated this policy also may be held personally liable for any damages, settlement costs or expenses, including attorney fees incurred by the University."

**(III)** **PURDUE POSSESSED KNOWLEDGE PRIOR TO SEPTEMBER 29, 2016 THAT DUERFAHRD VIOLATED ITS POLICIES**

22.　　Defendant Lance Duerfahrd was granted tenure by Purdue and was an Associate Professor of Film Studies. In the fall semester of 2016, Duerfahrd was the Director of Film and Video Studies program and was part of the Faculty for the English department.

23.　　Duerfahrd was known to officials at Purdue, including within the English Department, to enter amorous and inappropriate relationships with female students and subordinates within the English Department and the College of Liberal Arts. Officials knew that Duerfahrd was acting in direct violation of Purdue's Anti-Harassment policy as well as its Sexual Harassment and Amorous Relationship policies.

24.     One of the numerous instances of Duerfahrd's sexual misconduct occurred in October of 2011. Duerfahrd habitually invited students out for drinks at least once a week. On one occasion, Duerfahrd was out with five to six students at a bar. He pushed a female graduate student against a wall and sexually assaulted her by groping her breasts without permission. A few minutes after assaulting her, he told her that he would pay for contact lenses, so that he could better see her beautiful eyes.

25.     In the Spring Semester of 2012, the female student who was assaulted by Duerfahrd, was speaking with her academic advisor who recommended that she take a class with Duerfahrd. The student informed her advisor that she did not want to study under Duerfahrd because she was a victim of Duerfahrd's sexual assault. The academic advisor informed at least two other Faculty members within the English department about the incident with Duerfahrd.

26.     These allegations were brought up, including to the English Department head at the time, during Duerfahrd's tenure review in the Fall Semester of 2012 and ignored. Purdue was made aware that Duerfahrd sexually harassed and assaulted female students without consent. Purdue deliberately refused to enforce its own Sexual Harassment, Anti-Harassment and Amorous Relationship policies against Duerfahrd. Instead of holding Duerfahrd accountable for his sexual assault, Purdue chose to be deliberately indifferent by awarding

Duerfahrd tenure, despite actual knowledge that he sexually harassed and groped

female students. It was only a matter of time before it occurred again.

27.     Duerfahrd's behavior as a Professor was well-known by students and

staff alike. The consensus among Duerfahrd's students was that passing his courses

was contingent on attending private office hours. Despite the pretense of

discussing the material of the course, many times the conversations would turn

personal, graphic and harassing in nature. It is also common knowledge that

Duerfahrd had a particular exercise machine for women that would cause the body

to jiggle when it was used. Duerfahrd repeatedly would make the female students

in his class use the machine and on occasion ask them to use this particular

machine in front of other classmates without concern for the student's reluctance to

do so.

28.     A similar incident happened to a female student in the presence of her

classmates. Upset, the student sought help from the academic advisor, Debbie

Lloyd. After sending an email detailing Duerfahrd's abrasive and hostile manner of

speaking to female students and the ongoing jokes that were sexual in nature about

the Wizard of Oz and the student's parents by Duerfahrd, she was deferred to the

Academic Dean who promptly told her there was nothing that could be done as the

Dean did not handle such cases and was again deferred to the English department.

This type of deferment kept the student from being able to locate an appropriate

person who would be able to handle the complaint in a manner that did not disrupt the student's ongoing interactions with Duerfahrd. The student was obligated to continue the class with Duerfahrd despite his ongoing harassment which delayed her expected graduation date.

29.     On or about November 17, 2015, a female graduate student went to Professor Ryan Schneider, then the head of graduate studies in the English department, to complain about her sexual harassment by Duerfahrd. The student complained of multiple issues regarding Duerfahrd's inappropriate sexual nature and sexual violent themes in class and his class including pornography and making off-color jokes that "pussies are hard to train."

30.     The inappropriate sexual nature was not the main serious complaint. The student informed Professor Schneider that Duerfahrd suggested the student apply to be one of his teaching assistants. When the student went to Duerfahrd after class he explicitly suggested she perform oral sex on him. The graduate student declined. In response, instead of being a top-notch student, she received a B minus on her midterm. Professor Schneider was a mandatory reporter of Purdue. Professor Schneider acknowledged that the English department was aware of similar complaints as well as Duerfahrd having relationships in violation of the Amorous Relationship policy with both undergraduate and graduate students in the department.

31.     Professor Schneider admitted that "Purdue says it has a zero tolerance policy in regards to [quid pro quo sexual harassment] but what that means in practice depends on where the professor is in terms of hierarchy… particular instructors, tenured professors tenured associate professors that has a different set of circumstances than somebody who is a part time instructor."

32.     Professor Schneider admitted that he had similar conversations "with multiple people and we are well aware of this." He further admitted that: "you're not alone, you're not new…[y]ou're not on an island here… [o]ther people know about this." Professor Schneider indicated that Duerfahrd's relationship with undergraduate students and graduate students was a known issue and the "[i]t's being addressed in the undergrad level."

**(IV)   DUERFAHRD'S SEXUAL HARASSMENT ESCALATED TO SEXUAL VIOLENCE AGAINST JANE DOE DEPRIVING HER OF EDUCATIONAL OPPORTUNITIES**

33.     Plaintiff first enrolled at Purdue University during the fall semester of 2015 as an English Major. Plaintiff excelled during her first year, obtaining a 3.78 grade point average though the summer semester of 2016. Plaintiff decided at that time to double major in Film and Video Studies and Creative Writing. Thus, in the fall semester of 2016, Plaintiff enrolled in two courses taught by Duerfahrd, English 396, "Untraining the Eye, The History of Alternative Filmmaking" and English 286, "The Movies." The former course involved both a lecture and a lab

that Duerfahrd taught. The latter course was taught by a teaching assistant, with Duerfahrd overseeing with functional supervisory authority.

34.     As her professor, Duerfahrd told her that she "should try to go out more on a limb" than she has in order to do better in class and in her assignments and instructed her to meet him at his office hours regularly so that he can help improve her performance.  As a result, in an effort to acquiesce to his repeated demands to attend his office hours, which Duerfahrd insisted was necessary to succeed in his classes, Plaintiff started attending Duerfahrd's office hours regularly.

35.     When Plaintiff did not show up at office hours, Duerfahrd would demand in emails or in person that she provide an explanation for her absence. Duerfahrd would also ask Plaintiff intrusive questions about her personal life, such as questions about her dating and family relationships and her daily schedule. He would also chastise her for being too "straight-jacketed" and urge her "not to stay who she is." Duerfahrd told her that, as a teacher, he cared about her and wanted to help her. Yet, during office hours with her, Duerfahrd would rarely discuss anything about class, often telling her in their communications about his own personal life, such as information about his past sexual relationships. He invited her, a student at the University in his classes, to go out drinking with him, and even offered to introduce her to marijuana cigarettes. Duerfahrd also invited Plaintiff to

a party at the home of his colleague and chided Plaintiff again when she refused to attend. Plaintiff refused these interactions, explaining that she came from a conservative culture and did not party.

36.     Duerfahrd started calling her "babe" and repeatedly offered a three (3) credit independent study course to her which involved working with him one-on-one to produce a film festival, although Plaintiff had already informed him  that she was taking the maximum permitted course load of eighteen (18) credits and was disinclined to take up Duerfahrd's offer. Plaintiff subsequently dropped her astronomy class at Duerfahrd's exhortation and took up his independent study course instead.

37.     Undeterred, on or about September 20, 2016, Duerfahrd also began communicating with Plaintiff on his personal cellular phone. That evening, Duerfahrd contacted Plaintiff to meet him after hours to discuss the course. After Plaintiff voiced her apprehension, Duerfahrd questioned her seriousness and commitment to her classes and continued to pressure her until she reluctantly agreed to meet at 10:30 p.m. on campus. That late evening, Duerfahrd picked up Plaintiff and without telling her where they were going, drove her to a dark location adjacent to a cemetery and factory off campus. Instead of discussing the independent study course or her studies, Duerfahrd continued to probe further into

Plaintiff's personal life. Plaintiff was left confused and anxious as a result of Duerfahrd's actions.

38.    On September 22, 2016, in an attempt to avoid him, when Plaintiff skipped a film screening at which Duerfahrd was going to be present, he texted her after 10:00 p.m. and made his displeasure known and demanded to know why she didn't come to the screening or why she didn't inform him beforehand that she wasn't going to attend. When she told him that she was unwell, he inquired "Did the doctor ask you to stop masturbating?" and made light of her distress due to his misconduct.

39.    A few days later, on September 24, 2016, Duerfahrd again requested Plaintiff meet him again after hours. Plaintiff refused and told him she felt guilty because of their prior meetings and offered excuses for not being able to meet again, but he told her to "shut up" and drove to pick her up at her residence on campus. As was his modus operandi, Duerfahrd drove Plaintiff, yet again, to a dark secluded bridge located off campus. When Plaintiff asked where they were going, Duerfahrd refused to tell her, admonished her for questioning him and instructed her to just "relax and go with the flow." At the bridge, he handed her a bottle of wine and told her to come with him into a pitch dark entrance. Plaintiff panicked and emphatically refused the alcohol, as this was her professor and she was questioning his motives for trying to get her drunk. Duerfahrd lashed out at

Plaintiff for her refusal to drink the wine and her apprehension towards his advances, stating that he was just trying to give her "the extra college experience" but that she "didn't deserve it." During the drive to her home, Duerfahrd kept berating Plaintiff for wasting his time, misconstruing his benevolent efforts to help her, and forced Plaintiff to apologize for her actions.

40.     When she got home later, Plaintiff was distraught and panic-stricken, as she was worried that her failure to submit to her professor's demands would impact her grades in his classes and place her college career in jeopardy. Over the next few days, she communicated with Duerfahrd that she did not want a relationship of any sort with him. He assured her that his intentions were benign and insisted that they discuss her concerns in person, against Plaintiff's reluctance to do so.

41.     Three days later, on September 27, 2016, Duerfahrd contacted Plaintiff and requested that they meet again. Duerfahrd picked up Plaintiff on campus and drove her back to the isolated bridge, although she had specifically requested, due to her trauma from their prior meeting, not to return to that location. When they arrived at the bridge, Plaintiff began to experience panic attacks again. Duerfahrd attempted to placate a nervous Plaintiff by telling her that he would not hurt her in any way, and that he was only attempting to help her shed her inhibitions and be free-spirited. Duerfahrd, her Professor, held her hand on the

pretext of making her feel warmer on a chilly night. He told her than he saw

potential in her and that he was trying to spend so much time with her so he could

mentor her, and that she should feel grateful for the special treatment she was

receiving. Plaintiff was left even confused and anxious, more so than her last

interaction with Duerfahrd due to his unwelcome advances and the asymmetric

nature of their relationship. She continued to be deeply concerned regarding the

repercussions of ceasing contact with Duerfahrd.

42.     The stress of Duerfahrd's misconduct began to take a severe toll on

Plaintiff's mental and physical health. On September 28, 2018, she was too ill to

attend Duerfahrd's English 396 class. In this class Plaintiff had missed, Duerfahrd

had provided the class with information about the mid-term examination such as

the format and the syllabus so that the students could prepare for the exam.

43.     On the evening of September 29, 2016, the night before Plaintiff's

mid-term examination in the English 396 course, Plaintiff sought guidance from

Duerfahrd regarding the information she needed to review since she had missed the

class where he had explained these details. Duerfahrd responded that he would

help her, but on the condition that she agree to meet with him. He told her that she

would need to come to his private residence (which was located off-campus) where

he was preparing the exam. Duerfahrd picked up Plaintiff and brought her to his

residence. He provided her wine, which she was scared to refuse. When Plaintiff

suggested that they begin studying, Duerfahrd instead started vehemently kissing and groping Plaintiff. She reiterated that she only wanted to study, that she had no sexual desires for him, and that she wanted him to stop touching her.  Defendant insisted that she "had to enjoy making out" with her professor. Plaintiff pleaded to him to stop, told him that his forceful acts were causing her pain, and attempted to avoid his contact by physically pulling away from him, but Duerfahrd did not relent.

44.    Duerfahrd proceeded to commit unwanted sexual acts on Plaintiff.  He performed oral sex on Plaintiff with his mouth and teeth and digitally inserted his fingers inside Plaintiff's vagina. Plaintiff implored Duerfahrd to stop as he was hurting her, especially her genital area. Duerfahrd attempted to have penetrative sex with Plaintiff, which she refused. In response, he resumed kissing Plaintiff, telling her that he looked forward to having sex with her very soon. An overwhelmed Plaintiff kept telling Duerfahrd that she was so distressed as a result of his assault that she was going to fail her midterm the next day. Duerfahrd told her that she did not have to worry about her performance in class as long as she complied with his sexual demands. Duerfahrd started groping Plaintiff's breasts and genitals again and against her explicit instruction, and took her to his bedroom. Duerfahrd performed oral sex on Plaintiff again with his mouth and inserted his fingers into her vagina. When Plaintiff screamed out of pain and asked him to stop

hurting her, instead of stopping, he asked her if she enjoyed it. Duerfahrd then told Plaintiff to "move in" with him so they can "have sex every day, every hour."

45.     The next day, Duerfahrd ordered Plaintiff to meet in his on-campus office after the mid-term examination in his English 396 class, despite her stating that she was going to be late for her next class. When Plaintiff confessed her fears that she was going to fail her midterm, Duerfahrd told her that she had no reason to worry, instructed her to calm down and promised her that she would do fine on her exam. Duerfahrd then closed the door. Plaintiff, suspecting that he would try to assault her again, insisted that the door stay open. Undaunted, Duerfahrd proceeded to make sexually explicit comments to Plaintiff and attempted, yet again, to have sex with Plaintiff, his student, in his office. Despite her protests, he forcefully kissed her and groped her buttocks and genitals and unbuttoned her pants. Plaintiff managed to extract herself and then left for her class in a haze of distress. Plaintiff told Duerfahrd she did not want to meet again, but he told her that she had better not use the rules as an excuse to stop meeting him but also warned her against speaking about his misconduct because he could lose his job. Plaintiff mental health precipitously declined and she was unable to sleep restfully or concentrate in school due to the constant panic attacks and feelings of guilt and self-loathing.

---

46.     On October 2, 2016, Plaintiff became so fearful of Duerfahrd's unrelenting pressure to meet and have sex with him that she missed a required film screening for her class. This exacerbated her mental state because she knew that the missed film screening would impact her grade in the class. Moreover, Duerfahrd had instructed in the syllabus for his English 396 class that the experimental films being screened in class were not available to view online.

47.     Duerfahrd contacted her the next day, October 3, 2016, the last day she would ever meet with him, and informed her that the missed film would affect her (already slipping) grade significantly and that she should watch it at his home so as not to fall further behind. When Plaintiff voiced her apprehensions that Duerfahrd would try to assault her if she were to go to his home, he assured her that he would respect her wishes and wouldn't try to touch her. Concerned by her numerous prior class absences and her deteriorating grades, Plaintiff agreed. Once the film started playing, Duerfahrd proceeded again to sexually assault Plaintiff by attempting to put his hands in her pants and take her clothes off, which she protested. She reminded him of his promise not to touch her, but he refused, proceeding once again to force himself upon her and kissed her against her wishes. He touched her legs, breasts, neck, genitals and other portions of her body, and forced her at one point to place her hands on his penis and tried to force her to perform oral sex on him. When she told him "no" and resisted, Duerfahrd yelled at

her, telling his student that she did not understand his "sexual needs" and she was ungrateful for his precious time and was giving him nothing in return for being a "devoted lover." He even told her: "I think you want me to rape you" when she attempt to physically extricate herself from his clutches and blithely told her that if they did not have sex, he could not help her with class.

48.     Admonishing and deriding her relentlessly, Duerfahrd drove Plaintiff back to campus. He demanded she delete the electronic messages from their cellular phones as he was concerned about the fallout of the discovery of his misconduct and its ramifications on his job. Duerfahrd even took Plaintiff's phone from her, and deleted incriminating messages himself, although he had previously made Plaintiff place a passcode on her phone, to keep his abuse of Plaintiff a secret.

49.     On or about October 9, 2016, Duerfahrd callously informed Plaintiff that he could no longer offer her the three (3) credit independent study course, although he knew that she required the credits after dropping her astronomy class in reliance on his promises. This elevated Plaintiff's anxiety and distress, as Plaintiff needed to graduate by a certain time due to her concerns over her financial ability to pay for school.

50.    Duerfahrd proceeded to brag to colleagues about his purported sexual conquest of Plaintiff. He made demeaning, inappropriate comments about Plaintiff's genital area.

**(V)  PURDUE ACTED WITH DELIBERATE INDIFFERENCE IN FAILING TO DISCIPLINE DUERFAHRD PRIOR TO SEPTEMBER 29, 2016**

51.    Duerfahrd should have been disciplined far before the fall semester of 2016. Instead of awarding Duerfahrd with tenure and empowering him further, Purdue should have disciplined the known predator in its employ, since the time it possessed knowledge of Duerfahrd's predilections to harass female students. Had Purdue enforced its own policies, Duerfahrd would not have been in a position to sexually harass and assault Plaintiff. Purdue possessed enough knowledge of Duerfahrd's harassment that it could have reasonably responded with remedial measures expounded in its own policies that would have robbed Duerfahrd of the power to harass other women. Purdue knew that Duerfahrd had a reputation for flagrantly flaunting Purdue's Sexual Harassment and Amorous Relationship policies. Duerfahrd would bring female students as dates to parties at fellow faculty members' residences. However, Purdue recklessly refused to discipline Duerfahrd, instead enabling a known sexual predator's future sexual abuse by granting him tenure and thereby, bolstered power over the lives of hapless students. This ultimately culminated in the sexual assault of Plaintiff, whose

subsequent diagnoses included severe PTSD, major depressive disorder and
insomnia.

## (VI)  PURDUE'S FAILURE TO DISCIPLINE DUERFAHRD MADE PLAINTIFF VULNERABLE TO HARASSMENT

52.     Plaintiff stellar academic success promptly took a nose dive. Her
demeanor and appearance deteriorated. She stopped attending classes in October of
2016. If Purdue had enforced its own policies, it would have disciplined Duerfahrd,
far before the fall semester of 2016. In Summer 2017, Plaintiff transferred to
another university in order to be able to move on from the traumatizing ordeal at
Purdue. Now she is enrolled at a third university struggling to complete her once
successful undergraduate studies.

53.     Plaintiff suffered and continues to suffer serious physical, financial,
emotional and mental distress, trauma and damages as a result of the sexual
assault, sexual battery and rape at the hands of Duerfahrd, as well as Purdue's
deliberate indifference in refusing to discipline Duerfahrd prior to the sexual
harassment and assault of Plaintiff.

## (VII)  PURDUE PRESIDENT MITCHELL E. DANIELS RATIFIED DUERFAHRD'S ACTIONS

54.     Purdue's Office of Vice President for Ethics and Compliance
informed Duerfahrd on April 3, 2017 that they were recommending that Purdue's

President Mitchell E. Daniels, Jr., rejected the recommendation and refused to terminate Duerfahrd's employment and tenure.  In doing so, President Daniels and Purdue ratified Duerfahrd's actions.

55.      Prior to the events with Plaintiff, President Daniels intervened to preserve Duerfahrd's position at Purdue.

## FIRST CAUSE OF ACTION

### VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *ET SEQ.*
### (Against Defendant Purdue University)

56.      Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1 through 49 of this Complaint, as though fully set forth herein.

57.      Purdue operates an education program or activity receiving federal financial assistance. Under Title IX of the Education Act Amendments of 1972 (20 U.S.C. § 1681), the school may not exclude any person, on the basis of sex, from the participation in any education program or activity receiving federal financial assistance or deny benefits on the basis of sex or subject that person to sex-based discrimination.

58.      Professor Duerfahrd's conduct constituted "unwelcome sexual advances . . . and other verbal visual or physical conduct of a sexual nature" which

interfer[ed] with [Plaintiff's] education . . . creating an intimidating, hostile or offensive educational environment"

59.     The harassment perpetrated by Professor Duerfahrd was so severe, pervasive and persistent and so objectively offensive that it effectively barred Plaintiff access to educational opportunities or benefits, or limited her ability to participate in, or benefit from, the education program, and/or created a hostile or abusive educational environment.

60.     Purdue failed to protect Plaintiff, and other students and subordinates of Purdue, from the unwanted, inappropriate, injurious and continuing conduct of Professor Duerfahrd, by failing to discipline Duerfahrd, despite knowing of his repeated sexual harassment of female students and subordinates.

61.     These acts or omissions by Purdue are all in violation of Purdue's own policies, Title IX and Plaintiff's civil rights, in addition to other state and federal laws. Plaintiff filed the instant suit to obtain redress for the injuries caused by Defendants' conduct.

62.     As a direct and proximate result of this conduct, Plaintiff has suffered damages for which she is entitled to compensatory damages and injunctive relief, and because she has been compelled to employ attorneys, is entitled to attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## SECOND CAUSE OF ACTION

### SEXUAL ASSAULT
### (Against Defendant Lance Duerfahrd)

63.    Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1 through 56 of this Complaint, as though fully set forth herein.

64.    As described above, Professor Duerfahrd's conduct intended to cause, and did cause, Plaintiff to be placed in apprehension of harmful and offensive contact with her body.

65.    As a direct and proximate result of the aforementioned acts, Plaintiff was in fact placed in great apprehension of harmful and offensive conduct with her body.

66.    As a direct and proximate result of the aforementioned acts, Plaintiff was caused to and did suffer great and extreme emotional distress including shock, anxiety, worry, mortification, humiliation, and indignity. Said emotional distress continues from day to day and is of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure such distress.

67.    Professor Duerfahrd carried out the aforementioned acts knowing that emotional distress was substantially certain to be caused to Plaintiff. Yet, he

continued to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of Plaintiff.

68.     Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

### SEXUAL BATTERY
### (Against Defendant Lance Duerfahrd)

69.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1 through 62 of this Complaint, as though fully set forth herein.

70.     As described above, Professor Duerfahrd inappropriately touched Plaintiff, including her genitals and breasts.

71.     At no time did Plaintiff consent to these unwanted acts and touching.

72.     As a direct and proximate result of the aforementioned acts, Plaintiff was caused to and did suffer great and extreme emotional distress including shock, anxiety, worry, mortification, humiliation, and indignity. Jane Doe's emotional distress continues to this day and is of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure such distress.

73.     Professor Duerfahrd carried out the aforementioned acts knowing that great bodily injury and emotional distress were substantially certain to be caused to Plaintiff; yet he continued to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of Plaintiff.

74.      Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant Lance Duerfahrd)

75.      Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1 through 68 of this Complaint, as though fully set forth herein.

76.     As described above, Professor Duerfahrd actions were extreme and outrageous. Defendant's acts were intentional and/or reckless.

77.     Duerfahrd acts caused Plaintiff severe emotional distress.

78.     The acts by Professor Duerfahrd exceeded all bounds typically tolerated in a decent society and caused Plaintiff serious physical, financial, emotional and mental distress and trauma.

79.     Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

## FIFTH CAUSE OF ACTION

### NEGLIGENT RETENTION & SUPERVISION
**(Against Defendant Purdue University)**

80.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in paragraphs 1 through 72 of this Complaint, as though fully set forth herein.

81.     Purdue employed, supervised, and controlled Duerfahrd in his capacity as an associate professor.

82.     Purdue owed a duty to Plaintiff. *See M.S.D. of Martinsville v. Jackson*, 9 N.E.3d 230, 243 (Ind. Ct. App. 2014) (holding schools have a "special duty" to students).

83.     Purdue violated that duty by not taking reasonable steps to ensure Plaintiff's wellbeing while she attended Purdue.

84.     Purdue negligently supervised and/or retained Duerfahrd because it knew or should have known of his misconduct and prior violations of Purdue's policies. *See Grzan v. Charter Hosp. of Nw. Ind.* 702 N.Ed.2d 786, 793 (Ind. Ct. App. 1998) (holding an employer liable because it knew or "had reasons to know" of the misconduct of its employee but failed to take appropriate action).

85.     Purdue's violation of those duties caused Plaintiff to suffer serious physical, financial, emotional and mental distress, trauma and damages.

86.     Purdue further ratified Duerfahrd acts when President Daniels rejected the request to terminate Duerfahrd.

87.     Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.     General damages according to proof;

2.     Special damages according to proof;

3.     Punitive and exemplary damages against Defendant Lance Duerfahrd;

4.     Costs of suit incurred, reasonable attorneys' fees incurred; and

5.     Such other relief as the Court deems necessary and proper.

Dated: January 4, 2019            */s/ John P. Kristensen &*
                                  */s/ Marietto V. Massillamany*
                                  John P. Kristensen (*Pro Hac Vice*)
                                  *john@kristensenlaw.com*
                                  Christina M. Le (*Pro Hac Vice*)
                                  *christina@kristensenlaw.com*
                                  **KRISTENSEN WEISBERG, LLP**

                                  Marietto V. Massillamany (#24643-49)
                                  *mario@mjcattorneys.com*
                                  **MASSILLAMANY JETER & CARSON, LLP**

                                  **ATTORNEYS FOR PLAINTIFF**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all issues that may be decided by jury.

Dated: January 4, 2019

*/s/ John P. Kristensen &*
*/s/ Marietto V. Massillamany*
John P. Kristensen (*Pro Hac Vice*)
*john@kristensenlaw.com*
Christina M. Le (*Pro Hac Vice*)
*christina@kristensenlaw.com*
**KRISTENSEN WEISBERG, LLP**

Marietto V. Massillamany (#24643-49)
*mario@mjcattorneys.com*
**MASSILLAMANY JETER & CARSON, LLP**

**ATTORNEYS FOR PLAINTIFF**