# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| JANE DOE, an individual,  ) | |
|     Plaintiff  ) | |
|   )  | |
| vs.  ) | |
|   )  | CAUSE NO: 4:18-CV-00072-JVB |
| PURDUE UNIVERSITY, a public entity,  ) | |
| and LANCE DUERFAHRD, an  ) | |
| individual,  ) | |
|     Defendants.  ) | |

**PLAINTIFF JANE DOE'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ADDITIONAL MATERIAL FACTS IN OPPOSITION TO SUMMARY JUDGMENT**

COMES NOW Plaintiff, Jane Doe ("Defendant"), by counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1, respectfully submits this Response to Defendant's Statement of Material Facts in support of its Motion for Summary Judgment, and Additional Material Facts in Opposition to Summary Judgment.[1]

### RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.    In the Fall of 2016, Prof. Duerfahrd was employed as an Associate Professor at Purdue University.

**Response: Undisputed.**

2.    At that time, Plaintiff was a 21-year-old international undergraduate student.

**Response: Undisputed.**

---

[1] Plaintiff has redacted the individual names of students from the filings and evidentiary materials consistent with Purdue.

1

3.      Among the classes in which Plaintiff was enrolled that semester were one class taught by Prof. Duerfahrd and one class developed by Prof. Duerfahrd that was taught by a graduate student.

**Response: It is undisputed that Plaintiff was enrolled that semester in a class taught by Prof. Duerfahrd and one supervised by Prof. Duerfahrd and taught by graduate students. However, Prof. Duerfahrd also convinced Plaintiff to drop another class so she could enroll in a 3-credit independent study set up by him. In the end, Prof. Duerfahrd did not establish the independent study class as he had promised, despite Plaintiff's reliance thereon. [Ex 1, para. 10, 11, 14, 15, 16, 54.]**

4.      Plaintiff alleges that she met with Prof. Duerfahrd off campus on five separate occasions and that she was sexually assaulted by Prof. Duerfahrd on the fourth and fifth such occasions.

**Response:  It is undisputed that Plaintiff met with Prof. Duerfahrd off campus on five occasions, and that she was sexually assaulted on the fourth and fifth such occasions, but Plaintiff disputes any suggestion that these meetings were unrelated to the classes that attended, or the independent study course Prof. Duerfahrd had offered to her. [See Ex. 1, para. 20-52.]**

5.      Plaintiff alleges that, afterwards, she withdrew from classes and has been largely unable to resume her studies.

**Response: It is undisputed that Plaintiff withdrew from her classes after the second time she was sexually harassed and assaulted by Prof. Duerfahrd, and has been largely unable to resume her studies thereafter.**

### i. Purdue's Response to Plaintiff's Report of Harassment

6.      On September 21, 24, and 27, 2016, Plaintiff accompanied Prof. Duerfahrd on three off-campus excursions to nearby public locations.

**Response: It is undisputed that Plaintiff met Prof. Duerfahrd off-campus on September 21, 24 and 27, 2016, for what was portrayed as an academic exercise by Prof. Duerfahrd. Plaintiff disputes the connotations that these meetings were "excursions" or offered as anything other than academic exercises. [Ex. "1", para. 20-35.]**

7.      Plaintiff does not allege that any sexual contact occurred during these three excursions.

**Response: It is undisputed that during the first three meetings, Prof. Duerfahrd did not sexually assault her, however, Prof. Duerfahrd grabbed Plaintiff's hand during the third. [Ex. "1", para. 20-35.]**

8.      On September 29, Plaintiff visited Prof. Duerfahrd's off-campus home, where she alleges that Prof. Duerfahrd engaged in certain unwanted sexual activities with her.

**Response: Plaintiff admits that Prof. Duerfahrd offered to meet with Plaintiff at his off-campus home to assist her in preparing for her mid-term examination that was scheduled for the following day.  However, instead of helping her study for the exam, Prof. Duerfahrd sexually assaulted Plaintiff. [Ex. "1", para. 36-44.]**

9.      On October 4, Plaintiff again visited Prof. Duerfahrd's home, where she alleges that Prof. Duerfahrd again engaged in certain unwanted sexual activities.

**Response: Undisputed. Plaintiff admits that Prof. Duerfahrd offered to meet with Plaintiff at his off-campus home to screen a movie that was shown to his class.  However, Prof. Duerfahrd again sexually assaulted Plaintiff during that visit. [Ex. "1", para. 51-53.]**

10.     On October 31, 2016, an attorney retained by Plaintiff submitted a complaint to the U.S. Department of Education's Office for Civil Rights ("OCR") and faxed a copy of this OCR complaint to Purdue's Office of Institutional Equity ("OIE").

**Response: Undisputed.**

11.     This complaint alleged that Prof. Duerfahrd had committed certain acts of harassment against Plaintiff.

**Response: Undisputed.**

12.     There are no allegations in this complaint regarding any purported harassment of any other individual.

**Response: It is undisputed that the subject Complaint does not seek relief for anyone other than Plaintiff. However, Duerfahrd' prior harassment of other students was known to Purdue prior to the harassment and sexual assault of Plaintiff and is a part of her claims. [See below.]**

13.     Erin Oliver was at that time the Director of OIE and Purdue's Title IX Coordinator for the West Lafayette campus.

**Response: It is undisputed that Erin Oliver held such position on October 31, 2016, but she did not hold that position in the fall of 2015. [See below.]**

14.     On October 31, 2016, Ms. Oliver reached out to Plaintiff and asked to meet "as soon as possible" to discuss Plaintiff's need for academic accommodations and any "other measures that the university can take to address the complaint or to eliminate any safety concerns."

**Response: Undisputed.**

15.     There is no evidence that Plaintiff ever saw or interacted in any way with Prof. Duerfahrd after this date, other than within the context of this pending litigation.

**Response: Undisputed.**

16.     OIE is set up to be a general resource point for students who are utilizing university processes to request interim measures.

**Response: Undisputed.**

17.     Ms. Oliver's October 31, 2016 outreach contained information to assist Plaintiff in connecting with campus resources, including confidential advocacy available from Purdue's Center for Advocacy, Response & Education.

**Response: Undisputed.**

18.     On November 1, 2016, Ms. Oliver met with Plaintiff and Plaintiff's attorney.

**Response: Undisputed.**

19.     Following this meeting, Ms. Oliver worked with Purdue's University Residences office regarding Plaintiff's living situation, Purdue's registrar's office regarding Plaintiff's requested withdrawal from classes, and Purdue's International Students & Scholars office regarding Plaintiff's visa.

**Response: Undisputed.**

20.     At this time, Prof. Duerfahrd was placed on leave and was forbidden from returning to specific buildings (including the building where he taught and that housed his office) or contacting *any* Purdue student until the investigation was fully concluded.

**Response: Undisputed.**

21.     On November 2, 2016, Ms. Oliver contacted Plaintiff and Plaintiff's attorney to advice that Purdue intended to begin a university-initiated investigation.

**Response: Undisputed.**

22.     Plaintiff's attorney requested that Purdue "contact [him] before initiating

any type of investigation."

**Response: Undisputed.**

23.    At 3:01pm on November 2, 2016, Plaintiff's attorney submitted written allegations on behalf of Plaintiff.

**Response: Undisputed.**

24.    At 3:06pm on November 2, 2016, Plaintiff instructed Ms. Oliver to initiate an investigation.

**Response: Undisputed.**

25.    At 3:55pm on November 2, 2016, Ms. Oliver provided these allegations to Prof. Duerfahrd. Oliver Dep. 31:11-25 & Ex. K, Notice of Complaint.

**Response: Undisputed.**

26.    The OIE-appointed investigators proceeded to interview Plaintiff, Prof. Duerfahrd, and more than half a dozen potential witnesses.

**Response: Undisputed.**

27.    Plaintiff and Prof. Duerfahrd each provided documents to aid in the investigation, including emails and other messages the two had exchanged.

**Response: Undisputed.**

28.    While the investigation was still ongoing, Purdue arranged for Plaintiff's Fall 2016 registration to be administratively canceled, such that none of her courses would appear on her transcript.

**Response: Undisputed.**

29.    Purdue was also able to provide a reduced course load for the Spring 2017 semester, permitting Plaintiff to remain an admitted student (and therefore to remain in the

country on her F-1 visa) without taking any courses.

**Response: Undisputed.**

30.     The investigators completed their preliminary report on February 5, 2017.

**Response: Undisputed.**

31.     Plaintiff had an opportunity to review the preliminary report, and she provided written feedback to be addressed or otherwise incorporated into the final Investigator's Report. Investigator's Report p. 5.

**Response: Undisputed.**

32.     The final report was submitted to Erin Oliver on February 27, 2017.

**Response: Undisputed.**

33.     Pursuant to Purdue's policies, Ms. Oliver convened a panel of three members from Purdue's Advisory Committee on Equity on March 6, 2017.

**Response: Undisputed.**

34.     Ms. Oliver and the panel members reviewed the Investigator's Report along with the documents that the parties had provided.

**Response: Undisputed.**

35.     The investigators, Plaintiff, and Prof. Duerfahrd each met separately with Ms. Oliver and the panel.

36.     Ultimately, on March 16, 2017, Ms. Oliver determined that Prof. Duerfahrd's relationship with Plaintiff violated Purdue's Amorous Relationship policy, which addresses mutual and consensual romantic or sexual relationships where there is also a supervisory or evaluative relationship between the parties (e.g., a contemporaneous professor-student relationship).

**Response: It is undisputed that the OIE's final report determined that Duerfahrd violated Purdue's "Amorous Relationship" policy, however, Plaintiff disputes the suggestion that the OIE found there to be any consensual sexual relationship between Plaintiff and Duerfahrd.  [See Exhibit D attached to Defendant's Memorandum in Support of Summary Judgment.]**

37.     Because of the power disparity, Ms. Oliver also determined that certain of Prof. Duerfahrd's actions violated Purdue's Anti-Harassment Policy:

> I find that although the initial personal and romantic interactions between you and [Jane Doe] appear to have been welcomed by her, the preponderance of the evidence supports that the relationship developed quicker and more deeply than [Jane Doe] desired. . . . A preponderance of the evidence supports the existence of the relationship, combined with the disparity in power between you and [Jane Doe], unreasonably interfered with her educational endeavors and thereby created ahostile educational environment for her. . . . As a result, I find that your conduct constituted harassment and was in violation of the University's Anti-Harassment Policy[.]
>
> I further find that you engaged in sexual contact with [Jane Doe] which was unwelcome and without her consent  on September 29, 2017 [*sic*] and October 3, 2017 [*sic*] at your Tippecanoe County home.

Determination Letter p. 2; *see also* Oliver Dep. 56:15-57:18 & 107:16-108:8.

**Response: It is undisputed that the final report speaks for itself. Plaintiff disputes that the finding that Prof. Duerfahrd violated Purdue's Anti-Harassment Policy was based solely upon the power disparity, as the OIE also determined that Prof. Duerfahrd engaged in sexual contact with Plaintiff that was unwelcomed and without her consent. [See Exhibit D attached to Defendant's Memorandum in Support of Summary Judgment.]**

38.     Purdue is required to follow strict procedures before it can terminate the employment of any tenured faculty member.

8

**Response: Undisputed.**

39.     Ms. Oliver's determination letter included the recommendation that Purdue initiate formal proceedings to terminate Prof. Duerfahrd's employment.

**Response: Undisputed.**

40.     Prof. Duerfahrd appealed this decision to Alysa Christmas Rollock, Purdue's Vice President for Ethics and Compliance.

**Response: Undisputed.**

41.     Vice President Rollock denied the appeal on April 3, 2017, and formal termination proceedings were initiated.

**Response: Undisputed.**

42.     On July 3, 2017, Prof. Duerfahrd submitted his voluntary resignation, effective August 11, 2017.

**Response: Undisputed.**

43.     On February 20, 2020, Plaintiff's then-attorney, Jon Norinsberg, of Joseph & Norinsberg, LLC, stated as follows:

> [T]o the extent that you assert that Plaintiff has no claim for Purdue's conduct after October 2016 (i.e., its post-complaint investigation of Plaintiff's claims), we are in agreement on this point. Plaintiff does not intend to base her Title IX claim on the investigation that was conducted by Purdue after October 2016.

**Response: Undisputed.**

### ii. Purdue's Response to Prior Reports of Potentially Actionable Misconduct Prof. Duerfahrd

44.     Purdue's Title IX Coordinators are responsible for addressing complaints of alleged harassment. Purdue Policies Booklet p. 26 (as paginated).

**Response: Undisputed.**

45.     The Title IX Coordinators of each campus are empowered to investigate such allegations and, if warranted, to institute corrective measures on Purdue's behalf.

**Response: Undisputed.**

46.     OIE is the unit at Purdue that handles complaints of alleged misconduct, including by conducting investigations.

**Response: Undisputed.**

47.     There is no evidence that department-level employees—including staff, faculty, and department heads—are so empowered.

**Response: All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the OIE, which is the same as the Title IX Coordinator. [Ex. 3, p. 40, l. 24, through p. 41, l. 25; p. 43, ll. 9-25; p. 84, ll. 14-20.]**

48.     On the West Lafayette campus, the position of Title IX Coordinator is held by the Director of the Office of Institutional Equity.

**Response: Undisputed.**

49.     The Director of OIE is the decisionmaker for complaints of alleged misconduct involving a faculty or staff member.

**Response: Undisputed.**

50.     A report to West Lafayette campus OIE constitutes a report to a decisionmaker.

**Response: It is undisputed that a report to OIE constitutes a report to a decisionmaker.  Furthermore, notice to OIE constitutes notice of a decisionmaker of Purdue. [Ex. 3, p. 40, l. 24, through p. 41, l. 25; p. 43, ll. 9-25; p. 84, ll. 14-20; p. 85, ll. 8-25.]**

51.     A report must reach the Title IX Coordinator before the university knows of and can take action regarding that report.

**Response: All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the OIE, which is the same as the Title IX Coordinator. [Ex. 3, p. 40, l. 24, through p. 41, l. 25; p. 43, ll. 9-25; p. 84, ll. 14-20.] It is undisputed by Purdue that a report made from a mandatory reporter or student to the OIE would be a report to a decision-maker at Purdue, under Title IX. [Ex. 3, p. 85, ll. 8-25.]**

52.     In March of 2011, Prof. Duerfahrd and a group of graduate students crossed paths at a local bar. Ex. S, R.P. Dep. 16:10-17:19 & 32:16-19.

**Response: Undisputed.**

53.     Sometime thereafter, a subset of this group (including Prof. Duerfahrd) migrated to a second bar.

**Response: Undisputed.**

54.     At this second location, graduate student "R.P."[1] and Prof. Duerfahrd danced with each other. R.P. Dep. 29:11-30:3.

**Response: Undisputed.**

55.     There is no evidence that this dancing was anything other than consensual.

**Response: Undisputed.**

56.     At her deposition, R.P. stated that Prof. Duerfahrd's "hand or arm grazed [her] chest" while the two were dancing.

**Response: Undisputed.**

57.     At her deposition, R.P. refuted various allegations regarding her that are found in the Amended Complaint, including Plaintiff's use of the phrases "sexually

assaulted," "pushed . . . against a wall," "groping," and "breasts."

**Response: Undisputed.**

58.    After this March 2011 encounter, R.P. continued and completed the course she was taking with Prof. Duerfahrd.

**Response: Undisputed.**

59.    R.P. testified that this interaction had no effect on the rest of her semester with Prof. Duerfahrd.

**Response: Undisputed.**

60.    In early 2012, R.P. reported the March 2011 dance floor encounter to Professor Maren Linett and requested that Prof. Linett keep the report confidential.

**Response: Undisputed.**

61.    At this time, Nancy Peterson was the Head of the English Department. Linett Dep. 14:15-18; *see also* Peterson Dep. 7:4-15.

**Response: Undisputed.**

62.    Prof. Linett shared portions of R.P.'s story with Prof. Peterson.

**Response: Undisputed.**

63.    Subsequently, Prof. Linett submitted an anonymous report to Purdue's OIE.

**Response: Undisputed.**

64.    At this time, Monica Bloom was the Director of the Office of Institutional Equity on the West Lafayette campus.

**Response: Undisputed.**

65.   Ms. Bloom interviewed Prof. Peterson and Prof. Linett.

**Response: Undisputed.**

66.   Prof. Linett never once revealed R.P.'s name.

**Response: Undisputed.**

67.   There is no evidence demonstrating that the allegation of unwanted touching was ever substantiated.

**Response: Undisputed.**

68.   There is no evidence supporting a conclusion that drinking or dancing with students in a social setting in itself amounts to a policy violation.

**Response: Undisputed.**

69.   In "cases where conduct may not rise to the level of a policy violation, but it is still concerning or unacceptable conduct," OIE has a practice of coordinating with a dean or department head to communicate with the subject faculty member "to set expectations [and] to make the faculty member aware of concerns that [OIE has] received and put [the faculty member] on notice about those concerns."

**Response: It is undisputed that Wright testified that Purdue had such a policy, but that there is no evidence that this purported practice was implemented with respect to the claims made against Prof. Duerfahrd in 2015 and 2016, prior to Plaintiff's Complaint. [Ex. 2, p. 35, l. 22, through p. 39, l. 11; p. 56, l. 15, through p. 83, l. 9.]**

70.   Ms. Bloom and Prof. Peterson spoke to Prof. Duerfahrd and advised that he "needed to hold himself to a higher standard of conduct, even if university policy did not govern it."

**Response: It is undisputed that Ms. Bloom and Prof. Peterson spoke to Prof.**

**Duerfahrd in November of 2012, after receiving the anonymous complaint, and Prof. Peterson advised him that she did not think it was wise for him to go to a bar with students that he should not do it, and that he needed to hold himself to a higher standard of conduct even if university policy did not govern it. [Ex. 6, p. 42, l. 3, through p. 53, l. 8.]**

71.     There is no evidence of R.P. reporting any negative interactions with Prof. Duerfahrd after the 2011 dance floor encounter.

**Response: Undisputed.**

72.     There is no evidence that any other student reported any unwanted, inappropriate, or even questionable touching by Prof. Duerfahrd after this 2011 encounter and until Plaintiff reported her alleged sexual assaults in late October 2016.

**Response: As discussed below, Purdue received multiple reports of conduct by Prof. Duerfahrd that potentially constituted sexual harassment as defined by its Anti-Harassment Policy, and the reports by C.G. and A.S. may constitute "unwanted, inappropriate or questionable touching by Prof. Duerfahrd. [See below.]**

73.     On February 8, 2016, while investigating an unrelated matter, OIE received a report that Prof. Duerfahrd may have been in a romantic or sexual relationship with student "K.H."

**Response: Undisputed.**

74.     On February 11, 2016, OIE followed up by interviewing K.H., who denied the existence of any such relationship. Notes re. K.H. p. 2.

**Response: Undisputed.**

75.     There is no evidence that such a relationship ever in fact existed.

**Response: Undisputed.**

76.     There is no evidence of any subsequent report to OIE regarding Prof. Duerfahrd by or about K.H.

**Response: Undisputed.**

## ADDITIONAL MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDMENT

**Purdue's Actual Knowledge of Prof. Duerfahrd's Sexual Harassment of Female Students in His Classroom and Hostile Class Environment.**

77.     On December 16, 2021, Plaintiff took the Federal Rule 30(B)(6) deposition of Purdue University. Purdue chose Christina Wright to be its designated representative to address questions relating to the following subject matter:

(1) Any and all reports, claims or complaints about or relating to Lance Duerfahrd made by Purdue students G.G, C.G., or K.D. to the Office of Institutional Equity, the Chancellor, the Dean of Students, or the English Department, and any and all investigations or actions taken with respect to the same.

(2) Any and all reports of sexual harassment made by Purdue student A.S. regarding Lance Duerfahrd in September of 2016, and any and all investigations or actions taken with respect to the same.

[Exhibit 2, p. 5, l. 4, through p. 6, l. 6, Exhibit "2-A".]

78.     Purdue's designated representative testified that on November 13, 2015, OIE investigator Jacob Amberger ("Amberger") met with a student, GG, who submitted a written report and further described the following conduct by Prof. Duerfahrd:

A.      That in early fall of 2015 after watching a film that depicted sexual violence, Prof. Duerfahrd asked a female student about the film. The student reported that she was a survivor of sexual assault and was troubled by what she watched.  Prof. Duerfahrd responded to the female student that 'If that offended you, then subconsciously you wanted to be one of the girls".

15

B.     That after that incident, GG stayed after class to discuss a film with Prof. Duerfahrd. In the film, there was a large flower sitting on a piano. Prof. Duerfahrd asked GG she knew what was better than a flower on a piano, and when she responded that she did not, Prof. Duerfahrd replied, "Tulips on an organ." He then chuckled and stated, "Sorry, making a crude joke."

C.     That Prof. Duerfahrd showed a pornographic film to his class and read an autobiography by one of the actors. In the book, the male author writes about hitting a "Puerto Rican" so hard that he knocked her unconscious and a cut to her head that was bleeding. The author then wrote about tending to her wound and then engaging in intercourse with her while she was still unconscious. Prof. Duerfahrd asked GG her opinion on the book and she stated that she did not like the book because of the sexual abuse that was discussed. GG then reported that Prof. Duerfahrd "belittled" her in class, telling her that he wanted to talk about the craft, not the content of the book.

D.     That Prof. Duerfahrd gave his midterm exam, and one of the questions asked something similar to, "You are watching pornography and you are turned on by the acting and not the sex depicted, and you were going to masturbate, describe how that would be."

E.     That GG was made by Prof. Duerfahrd to sit in the front of the class while he showed the class a pornographic film because Prof. Duerfahrd stated that he did not feel like she was paying enough attention.

F.     That an undergraduate in class has talked about going to strip clubs with Prof. Duerfahrd and others have reported seeing this undergraduate and Prof. Duerfahrd in bars together."

G.     That Prof. Duerfahrd showed a film in class entitled "Pink Flamingos" and the film depicted a rape scene, a woman eating dog feces, and someone engaging in intercourse with a chicken.

H.     That Prof. Duerfahrd's conduct in class had gotten worse as the class progressed.

[Ex. 2, p. 49, l. 16, through p. 55, l. 12; Ex. 7, para. 1-6.]

79.     G.G., in fact, not only met and reported her claims that she and other students were being sexually harassed by Prof. Duerfahrd both during and after class, but she personally met and reported the harassment and specific instances of misconduct by Prof. Duerfahrd to the OIE, the Head of the English Department, and the Director of Graduate Studies for the English Department. [Ex. 7, para. 1-6; Ex. 8, para. 1-6.]

80.     At the time, she was not only concerned about the harassment, but also concerned that

Prof. Duerfahrd would retaliate against her since she was still in his class, and accordingly, she asked that her report remain confidential until she completed Prof. Duerfahrd's class. [Ex. 7, para. 7; Ex. 8, para. 7.]

81.     She also brought her friend and boyfriend at the time, Jake Zucker to support her during this difficult time. [Ex. 7, para. 4; Ex. 8, para. 4.]

82.     During the meetings, the Purdue employees made clear that they were well-aware of Prof. Duerfahrd's harassment of female students, representing that it was an "open secret". [Ex. 7, para. 8; Ex. 8, para. 8.]

83.     G.G. was further advised by the OIE that they had sufficient information about Prof. Duerfahrd's conduct to move forward with action against him involving the English Department, and that she would not be required to make a formal complaint using my actual name. [Ex. 7, para.9; Ex. 8, para. 9.]

84.     However, G.G. was never advised that any action was taken against Prof. Duerfahrd regarding her report, nor did OIE request anything further from her after her class with Prof. Duerfahrd was completed. [Ex. 7, para. 10.]

85.     Also on November 13, 2015, Amberger met with another student, C.G., who reported that she became uncomfortable after Prof. Duerfahrd began asking her personal questions during office hours. Prof. Duerfahrd further had asked her to come after class, and yelled at her, got close and physically intimidated her, blocking her so she could not leave the room. He then told her "You're entitled" "You're fucking entitled" and left the room.  C.G. further reported to Amberger that Prof. Duerfahrd had a midterm exam that asked the students to describe masturbating while watching porn, and that C.G. had dropped Prof. Duerfahrd's class.  [Ex. 2, p. 42, l. 24, through p. 47, l. 22; p. 55, ll. 13-56, l. 3.]

86.     On November 18, 2015, Amberger and Purdue's Associate Director of OIE, Erin Oliver, met with a third student, K.D., who reported the following misconduct by Prof. Duerfahrd in his class:

A.      That Professor Duerfahrd was using vulgar language in class and targeting it at students.
B.      That female students were uncomfortable with Prof. Duerfahrd's sexual comments directed to them.
C.      That Prof. Duerfahrd made comments during class involving sexual innuendo hurt K.D.'s feelings and made her feel uncomfortable.
D.      That Prof. Duerfahrd constantly makes sexual or sexist comments that make the women in class incredibly uncomfortable.
E.      That the class itself is an incredibly hostile environment to female students.

[Ex. 2, p. 12, l. 17, through p. 13, l. 16; p. 16, l. 24, through p. 22, l. 16; p. 29, l. 10, through p. 31, l. 14; p. 33, l. 12, through p. 35, l. 18.]

87.     K.D. further provided OIE with a written report of her concerns and a recording of a class of Prof. Duerfahrd's that bothered K.D.  [Ex. 2, p. 29, l. 10, through p. 31, l. 14.]

88.     The reports of these meetings were provided to Monica Bloom, who at the time, was the Director of the OIE and Title IX Coordinator. [Ex. 2, p. 12, through p. 36, l. 13; p. 49, l. 16, through p. 50, l. 20; p. 63, ll. 11-25.]

89.     In its policies, Purdue defined sexual harassment as "Any unwelcome sexual advance, request for sexual favors or other written, verbal or physical conduct of a sexual nature when: Such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance or creating an intimidating, offensive or hostile environment for that individual's employment, education or participation in a University activity". [Ex. 2, p. 26, l. 19, through p. 27, l. 8.]

90.      Purdue did not dispute that K.D.'s report included conduct by Prof. Duerfahrd that would potentially violate Purdue's sexual harassment policy.  [Ex. 2, p. 28, l. 25, through p. 29, l. 6.]

91.     However, OIE did not initiate an investigation of Prof. Duerfahrd, nor did it take any action with respect to the complaints against Prof. Duerfahrd. [Ex. 2, p. 35, l. 22, through p. 39, l. 11; p. 56, l. 15, through p. 83, l. 9.]

92.     Wright testified that it was her understanding that Bloom was "going to reach out to the department head" regarding the reports of the three students regarding Prof. Duerfahrd's conduct, however there is no documentation or evidence of that having occurred.  [*Id.*]

93.     OIE had the authority to initiate its own investigation of Prof. Duerfahrd based upon the reports it received, but did not do so.  [p. 65, l. 14, through p. 66, l. 8.]

94.     Wright testified that is was a common practice at Purdue, when a faculty member's concerning or unacceptable conduct did not rise to the level of a policy violation for OIE to reach out to the department head and the faculty member, sometimes in conjunction with human resources, and to notify the faculty member of their concerns.  [Ex. 2, p. 37, l. 20, through p. 38, l. 14.]

95.     However, there is no evidence that OIE did anything to address the concerned the students raised about Prof. Duerfahrd's misconduct in November of 2015.  [Ex. 2, p. 35, l. 22, through p. 39, l. 11; p. 56, l. 15, through p. 83, l. 9.]

96.     OIE was Purdue's primary contact for reports of sexual harassment, and the only body with authority to investigate those reports. [Ex. 2, p. 43, l. 19, through p. 44, l. 13; Ex. 3]

97.     There is also no evidence that Purdue's English Department did anything to address the concerns raised by the students regarding Prof. Duerfahrd's misconduct in 2015. [Ex. 2, p. 67, l. 12, through p. 70, l. 7; p. 80, l. 13, through p. 83, l. 9.]

98.     Prof. Duerfahrd himself testified that Purdue never even discussed any issues or concerns with his class or interactions with students during this time period.  [Ex. 4, p. 48, l. 24, through p. 50, l. 14.]

99.     Later, on September 21, 2016, OIE received a report from of a sexual harassment allegation against Prof. Duerfahrd regarding a student, A.S. [Ex. 2, p. 83, 21. 25. through p. 84, 1. 4.]

100.    The student met with Amberger and reported that Prof. Duerfahrd directed her to spit out gum into his hand during his office hours. [Ex. 2, p. 87, 16. 22.]

101.    Prof. Duerfahrd then put the gum in his own mouth, asked the student how long she had been chewing it. [Ex. 2, p. 87, 23. 25.]

102.    Thereafter, Prof. Duerfahrd directed A.S. to return to his office hours on Friday, Sept. 16, 2016, and to bring a different flavor of gum with her. [Ex 2, p. 88, 2.]

103.    When A.S. returned to Prof. Duerfahrd's office hours, as directed, Prof. Duerfahrd gave her a speech about "getting out of her comfort zone" and had her get in an exercise machine that made her body shake. [Ex. 2, p. 88, 7. 13.]

104.    A.S. felt uncomfortable on the machine and got off. [Ex. 2, p. 88, 14. 19.]

105.    A.S. further reported that other students in Prof. Duerfahrd's class were compiling stories regarding Prof. Duerfahrd's behavior. [Ex. 2, p. 96, 8. 13.]

106.    Again, OIE did not open an investigation into Prof. Duerfahrd's behavior prior to the Complaint of Plaintiff filed on October 31, 2016. [Ex. 2, p.102, 9. 14.]

107.    According to Purdue's Anti-Harassment Policies, the term "Harassment" includes sexual harassment, and is defined as "Conduct towards another person or identifiable group of persons that has the purpose or effect of: Creating an intimidating or hostile educational environment, work environment or environment for participation in a University activity. [Ex. 3, p. 69, l. 17, through p. 70, l. 1.]

108.    The Purdue Anti-Harassment Policies also provided that:

The University reserves the right to investigate circumstances that may involve Harassment in situations where no complaint, formal or informal, has been filed. In appropriate circumstances, sanctions in accordance with this policy will be implemented. To determine whether a particular act or course of conduct constitutes Harassment under this policy, the alleged behavior will be evaluated by considering the totality of the particular circumstances, including the nature, frequency, intensity, location, context and duration of the questioned behavior. Although repeated incidents generally create a stronger claim of Harassment, a serious incident, even if isolated, can be sufficient.

[Ex. 3, p. 49, l. 24, through p. 41, l. 25.]

109.   The Purdue Anti-Harassment Policies also provided that:

The University has an obligation to respond to information of which it becomes aware, whether received directly or indirectly. That is, the University's obligation may be triggered by a direct disclosure by those who have experienced potential discrimination or harassment or by gaining indirect knowledge of such information. For this reason, the University may initiate an investigation of circumstances that involve potential discrimination and/or harassment even where no complaint, formal or informal, has been filed. In those circumstances, the University may elect to investigate and, if warranted, impose disciplinary sanctions pursuant to these or other established University procedures.

[Ex. 3, p. 76, l. 16, through p. 77, l. 7.]

110.   During the 2015-16 academic year, the Policy included a couple of paragraphs that provided that sanctions for conduct that constitutes harassment, as defined by the policy, would be subject to enhancement when such conduct is motivated by bias based on a person's legally protected status as defined by federal and state law:· e.g., race, gender, religion, color, age, national origin or ancestry, genetic information, or disability. [Ex. 3, p.53, ll. 11-20.]

111.   It is undisputed that if a teacher engages in classroom activities that constitute harassment, that would be prohibited under the Policy. [P. 78, l. 22, through p. 79, l. 9.]

112.   All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the OIE, which is the same as the Title IX Coordinator. [Ex. 3, p. 40, l. 24, through p. 41, l. 25; p. 43, ll. 9-25; p. 84, ll. 14-20.]

113.   It is undisputed by Purdue that a report made from a mandatory reporter or student to the OIE would be a report to a decision-maker at Purdue, under Title IX. [Ex. 3, p. 85, ll. 8-25.]

114.   Accordingly, all of the reports of harassment brought by Prof. Duerfahrd's students in the fall of 2015 and 2016 were ultimately reported to Purdue's decision-maker, the OIE. Furthermore, Purdue's own Policy triggered an obligation for it to respond once it received those

reports, and further authorized Purdue to investigate Prof. Duerfahrd's conduct, and if warranted, impose disciplinary sanctions pursuant to the Policy. [Ex. 3, p. 76, l. 16, through p. 77, l. 7.]

**Plaintiff's Background and Sexual Harassment and Sexual Assault by Prof. Duerfahrd**

115.   Jane Doe was born and raised in India. [Ex. 1, para. 2]

116.   Jane Doe came to the United States on a Student Visa, and began attending Purdue University in the fall of 2015. In my culture, premarital sexual conduct is taboo.  [Ex. 1, para. 3]

117.   Even the discussion of sex was taboo and accordingly, Jane Doe had no sexual education whatsoever. [Ex. 1, para. 4]

118.   Jane Doe had an ultra-conservative upbringing.  Jane Doe did not date or otherwise engage in consensual sexual activity. [Ex. 1, para. 5]

119.   In Jane Doe culture, teachers are revered, and students are taught to submit to their authority. Jane Doe saw and experienced verbal abuse and corporal punishment by teachers. [Ex. 1, para. 6]

120.   The concept of a sexual relationship with a teacher or professor is unimaginable. [Ex. 1, para. 7]

121.   After Jane Doe's first year of studies at Purdue, when she decided to major in film studies, and was looking for opportunities to learn filmmaking, Jane Doe ended up reaching out Prof. Duerfahrd in August of 2016 without knowing that she was reaching out to a professor.  [Ex. 1, para. 8]

122.   In the email chain, Jane Doe reported to Prof. Duerfahrd that Jane Doe was interested in majoring in Film Studies, and Prof. Duerfahrd informed me that he was the Head of the Film Studies Program.  [Ex. 1, para. 9]

123.   Jane Doe had already enrolled in English 286, The Movies, a class whose lab Prof. Duerfahrd was responsible for and whose lecture was taught by graduate students who reported to

him. [Ex. 1, para. 10]

124.    Prof. Duerfahrd urged Jane Doe to enroll in another one of his classes. Jane Doe communicated to him that she was already enrolled in Eng 286 The Movies, but he urged her to enroll in English 396, Untraining the Eye- A history of Alternative Film Making, over which Prof. Duerfahrd had complete power. [Ex. 1, para. 11]

125.     Prof. Duerfahrd asked me to meet him as soon as Jane Doe arrived on campus. Due to a clash with her astronomy class, she couldn't attend office hours. Prof. Duerfahrd reached out to Jane Doe, insisted that she attend office hours even though it meant missing out on astronomy class. [Ex. 1, para. 12]

126.    On September 1, 2016, Jane Doe met with Prof. Duerfahrd after a Film and Video Studies Program "call out".  [Ex. 1, para. 13]

127.    During the meeting, Prof. Duerfahrd exhorted Jane Doe again to drop her astronomy class. Jane Doe was reluctant to do so because she was enrolled in the maximum of 18 credits allowed per semester for financial reasons. Prof. Duerfahrd promised Jane Doe a 3 credit independent study program to replace the astronomy class credits and suggested that she work with him on two film festivals. In reliance on his offer, Jane Doe later dropped her astronomy class.  [Ex. 1, para. 14]

128.     Prof. Duerfahrd also asked Jane Doe to sign up for a paid internship with him, however, after she advised Prof. Duerfahrd of her interest, he informed Jane Doe that the deadline had passed and that if she brought him an "add form" from the registrar, he could add the three (3) credit "independent study" course for her help with the film festivals.  [Ex. 1, para. 15]

129.    Thereafter, Jane Doe tried to arrange to meet with Prof. Duerfahrd at his office to sign the add form for the independent study class, but Prof. Duerfahrd instead suggested that we "meet and talk about real things. [Ex. 1, para. 16]

130.    He then gave Jane Doe his personal cell phone number and asked Jane Doe to text

him instead of emailing to his office email address.  [Ex. 1, para. 17]

131.    Prof. Duerfahrd and Jane Doe then began text messaging each other, first via cell phone and thereafter via WhatsApp. [Ex. 1, para. 18]

132.    Jane Doe again tried to get Prof. Duerfahrd to meet and add the independent study class, but to avail..  Having never taken an independent study before, Jane Doe was unfamiliar with how they worked. But Prof. Duerfahrd conveyed that Jane Doe needn't worry too much about registering. [Ex. 1, para. 19]

133.    Prof. Duerfahrd initially arranged to meet with Jane Doe on campus to discuss class, but on the evening of September 21, 2016, he picked Jane Doe up around 10 p.m., and despite Jane Doe's apprehensions, drove her to an unknown off campus location, parked in a dark and deserted area, and walked her through a cemetery, crossed over the train tracks and sat down near a factory. [Ex. 1, para. 20]

134.    Prof. Duerfahrd explained the trip as an academic exercise, and not a social visit. He asked Jane Doe to describe the factory creatively, but soon changed the topic to personal matters. He inquired if Jane Doe had watched a film that he'd recommended she watch, which he considered the most romantic love story ever. Jane Doe told him that she abandoned it midway because it was a sexually explicit movie depicting the rape of a teenager by a man in his 50s. Jane Doe explained that she found the abuse to be disconcerting. It was eerie how the age of the girl mirrored Jane Doe's and the age of her rapist mirrored Jane Doe professor's. Prof. Duerfahrd insisted that the abuse was painful but consensual. He screamed at Jane Doe and even threatened Jane Doe for her lack of compliance. [Ex. 1, para. 21]

135.    Jane Doe was terrified of his temper and wanted to smooth things out. [Ex. 1, para. 22]

136.    Jane Doe thanked Prof. Duerfahrd after the trip, although she felt   extremely

uncomfortable with being alone with her professor off campus, in a dark and secluded area. [Ex. 1, para. 23]

137.    September 22, 2016, in an attempt to avoid him, Jane Doe skipped a film screening at which Prof. Duerfahrd was going to be present.  Prof. Duerfahrd texted Jane Doe after 10:00 p.m., made his displeasure known and demanded to know why Jane Doe didn't come to the screening. [Ex. 1, para. 24]

138.    When Jane Doe told him that she was unwell, he inquired, shockingly, "Did the doctor ask you to stop masturbating?" Prof. Duerfahrd proceeded to make light of her distress due to his actions. [Ex. 1, para. 25]

139.    Thereafter, Prof. Duerfahrd asked to meet with Jane Doe the evening of September 24, 2016. Jane Doe offered excuses not to meet, told him that her mental health was suffering as a result of our meetings but was told to "shut up".  [Ex. 1, para. 26]

140.    Prof. Duerfahrd picked Jane Doe up on campus at around midnight and again drove her to an dark, deserted, unknown off campus location, which turned out to be a bridge. [Ex. 1, para. 27]

141.    As we were getting out of Prof. Duerfahrd's vehicle, he took out a bottle of wine. [Ex. 1, para. 28]

142.    After seeing the wine bottle, Jane Doe was filled with dread and questioned Prof. Duerfahrd's intentions for trying to get her drunk and asked him what he wanted from Jane Doe. [Ex. 1, para. 29]

143.    Prof. Duerfahrd exploded with rage and informed Jane Doe that he was just giving her the extra college experience and that Jane Doe did not deserve it. He berated Jane Doe for misconstruing his benevolent efforts to teach her. [Ex. 1, para. 30]

144.    Prof. Duerfahrd abruptly drove Jane Doe home and chastised her and made her

25

apologize all the way.

145.    Jane Doe spoke to Prof. Duerfahrd by phone on September 25, 2016, and informed

him that she did not want to be in a romantic relationship and wanted to focus on her academics. [Ex.

1, para. 31]

146.    Prof. Duerfahrd again assured Jane Doe that his intentions were purely platonic and

that he was just trying to help her academically. But he said that he wanted to have that conversation

in person and arranged to meet Jane Doe on September 27, 2016.  [Ex. 1, para. 32]

147.    They met around 9:45 pm., and Prof. Duerfahrd drove Jane Doe back to the same

bridge despite her fears. [Ex. 1, para. 34]

148.    During the meeting, Jane Doe was extremely cold and Prof. Duerfahrd grabbed her

hand on the pretext that he was just helping her warm up.  He assured Jane Doe that he was only

trying to help her. [Ex. 1, para. 35]

149.    Prof. Duerfahrd's midterm exam was scheduled for September 30, 2016. [Ex. 1, para.

36]

150.    Due to the stress of his misconduct, Jane Doe was unwell and ended up missing a

class wherein Prof. Duerfahrd discussed the syllabus for the experimental midterm examination and

advised students on how to prepare for it. [Ex. 1, para. 37]

151.    Rather than providing the information via email, Prof. Duerfahrd told Jane Doe that

she would have to meet him in person the evening before the exam to go over what would be on the

test. [Ex. 1, para. 38]

152.    Prof. Duerfahrd then picked Jane Doe up around 10 p.m. on September 29, 2016, the

evening before the midterm exam.  [Ex. 1, para. 39]

153.    When Jane Doe arrived at Prof. Duerfahrd's residence, Prof. Duerfahrd asked Jane

Doe some questions regarding one film from the class, but then began talking about his personal life.

When Jane Doe asked that they start studying, he instead started kissing Jane Doe. [Ex. 1, para. 40]

154.    Jane Doe resisted and informed Prof. Duerfahrd that Jane Doe did not want this.  [Ex. 1, para. 41]

155.    They subsequently sat down, and Prof.  Deurfahrd continued making sexual advances towards Jane Doe.  [Ex. 1, para. 42]

156.    Jane Doe continued to make clear that Jane Doe did not want him to touch her,  but Prof. Duerfahrd persisted in his advances. [Ex. 1, para. 43]

157.    That night, rather than helping Jane Doe prepare for her midterm exam, her professor, Lance Duerfahrd sexually assaulted her multiple times. [Ex. 1, para. 44]

158.    Jane Doe was alarmed that the sexual contact between her and her professor would be in violation of university rules and asked him about it. He said that he was not sure, but it was probably a violation of the rules. [Ex. 1, para. 45]

159.    The following day, on September 30th 2016, Jane Doe went to class and took the exam under extreme duress. After class, he ordered her to come to his office, despite knowing that it would make her  late to my next class. [Ex. 1, para. 46]

160.    In his office, he sexually assaulted Jane Doe again. Jane Doe resisted. Jane Doe told him that they could get caught and Jane Doe feared the ramifications of that. He admitted that their sexual contact was indeed against the rules. Jane Doe was paralyzed by the possibility of being held punished for what he had done to her. [Ex. 1, para. 47]

161.    Prof. Duerfahrd asked Jane Doe to keep their meetings a secret, but warned Jane Doe not to use the rules as an excuse not to being in a sexual relationship with him. Jane Doe felt even more under Prof. Duerfahrd's control than before. He convinced Jane Doe that she was at fault for his unwanted actions towards her. [Ex. 1, para. 48]

162.    Jane Doe felt trapped and alone. Failing or dropping all his classes or be expelled

from Purdue could cost Jane Doe her student Visa.  [Ex. 1, para. 49]

163.    On October 3rd 2016, due to Prof. Duerfhard's unrelenting pressure to meet and have sex, Jane Doe missed a film screening after which he had wanted to pick Jane Doe up in a bid to avoid him. [Ex. 1, para. 50]

164.    However, that only affected Jane Doe's standing in his class further as the experimental films being screened were not available to view online. Prof. Duerfahrd asked Jane Doe to meet to watch the film at his home and warned Jane Doe that she was falling behind in the class. He promised not to get physical with her. Concerned for her grade, on October 4, 2016, Jane Doe met with Prof. Duerfahrd for the last time to watch the missed films with him. [Ex. 1, para. 51]

165.    During the viewing of the film, Prof. Duerfahrd tried to make sexual contact with Jane Doe again and Jane Doe continued to resist his attempts. [Ex. 1, para. 52]

166.    Prof. Duerfahrd told Jane Doe in anger that she just wanted him to "rape" her and made it clear that if they didn't have sex, they couldn't have a working student teacher relationship. Yet, Jane Doe did not give in to his abuse. [Ex. 1, para. 53]

167.    Thereafter, Jane Doe became fearful of retaliation and tried yet again to get Prof. Duerfahrd to finally sign off on the independent study class, but Prof. Duerfahrd informed Jane Doe that he had suddenly decided against the movie festival and that she could not get the three credits Jane Doe had been promised. [Ex. 1, para. 54]

168.    He stated, "I don't dig non-reciprocal relationships." [Ex. 1, para. 55]

169.    Jane Doe finally realized that Prof. Duerfahrd would not stop harassing me until she gave in to his abuse. [Ex. 1, para. 56]

170.    Jane Doe felt hopelessly cornered. Jane Doe stopped attending class but her professor kept calling and texting her. Jane Doe was terrified of jeopardizing her immigration status due to her abysmal attendance, but Jane Doe did not want to put herself in harm's way. [Ex. 1, para. 57]

171.   Jane Doe did some research online to understand how she could navigate her predicament. Jane Doe tried to get help protect herself from Prof. Duerfahrd.  [Ex. 1, para. 58]

172.   Jane Doe retained counsel, who filed a formal complaint against Prof. Duerfahrd with Purdue University. [Ex. 1, para. 59]

173.   Despite opposition from Jane Doe's parents, who insisted that Jane Doe immediately return home instead,  filed a formal complaint against Prof. Duerfahrd. Not only did Jane Doe risk losing her Student Visa, but Jane Doe also faced the petrifying possibility of social ostracization in her home country if Prof. Duerfahrd's sexual assault against her were to come to light. [Ex. 1, para. 60]

174.   Due to Jane Doe's report, Prof. Duerfahrd was prevented from to victimizing another student, and Purdue University had to finally let Prof. Duerfahrd go from his position. [Ex. 1, para. 61]

**175.**   Jane Doe have suffered and continue to suffer great harm and pain, as a result of Prof. Duerfahrd's sexual harassment and sexual assault, and Purdue Universities failure to take action before it was too late. [Ex. 1, para. 62]

**176.**   Jane Doe has been diagnosed with Post traumatic stress disorder, panic disorder and agoraphobia due to the assaults by Prof. Duerfahrd. [Ex. 1, para. 63]

Respectfully submitted,

ASHFORD LAW GROUP, P.C.

BY:  C. ANTHONY ASHFORD - #19253-02

_/s/ C. Anthony Ashford_____
Ashford Law Group, P.C.
332 W. 806 N.
Valparaiso, IN 46385
(219) 728-5210

Cashfordlaw1@gmail.com
Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 30**th day of June, 2022**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

- **C Anthony Ashford**
  cashfordlaw1@gmail.com
- William P. Kealy
  wpk@stuartlaw.com
- Mathew M. Humble
  mmh@stuartlaw.com
- Matthew Ryan
  mryan@cotsiriloslaw.com

**Manual Notice List:  None**

/s/Anthony Ashford