UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| JANE DOE,<br>      Plaintiff,<br><br>v.<br><br>LANCE DUERFAHRD and<br>PURDUE UNIVERSITY,<br>      Defendants. | )<br>)<br>)<br>) CAUSE NO.: 4:18-CV-72-JVB-JEM<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

This matter is before the Court on Defendant The Trustees of Purdue University's Motion for Judgment on the Pleadings [DE 192] filed on May 3, 2022, and on Defendant The Trustees of Purdue University's Motion for Summary Judgment [DE 194] filed on May 23, 2022. No response to the motion for judgment on the pleadings was filed. Plaintiff Jane Doe filed a response to the motion for summary judgment on June 30, 2022, and Defendant Purdue University ("Purdue") filed a reply on July 22, 2022. Defendant Lance Duerfahrd has not filed any document related to these motions.

Doe initiated this cause of action on September 20, 2018. She filed an amended complaint on January 4, 2019. A motion to dismiss Doe's fifth claim was granted on August 29, 2019. The remaining claims are (1) a Title IX violation, brought against Purdue, (2) sexual assault, brought against Duerfahrd, (3) sexual battery, brought against Duerfahrd, and (4) intentional infliction of emotional distress, brought against Duerfahrd. Only the Title IX claim against Purdue is at issue in the present motions.

**MOTION FOR JUDGMENT ON THE PLEADINGS**

In the motion for judgment on the pleadings, Purdue asks the Court to dismiss any claim for emotional distress damages that Doe is bringing against Purdue. In *Cummings v. Premier*

*Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562 (2022), the Supreme Court determined that emotional distress damages are not recoverable under the Spending Clause statutes of the Rehabilitation Act and the Affordable Care Act. *Id.* at 1569, 1576. Title IX is also a Spending Clause statute. *Id.* at 1569. Purdue asserts that *Cummings* establishes that emotional distress damages are not available under Title IX. Doe has not responded. In light of Purdue's motion and with no argument to the contrary provided, the Court finds that, as Title IX is a Spending Clause statute, the reasoning applied to the Rehabilitation Act and the Affordable Care Act in *Cummings* applies equally to Title IX, and Doe's complaint therefore fails to state a claim for emotional distress damages upon which relief can be granted against Purdue. *See Doe v. Purdue Univ.*, No. 2:17-CV-33, 2022 WL 3279234, at *13 (N.D. Ind. Aug. 11, 2022) (dismissing, based on *Cummings*, claim for emotional and psychological damages in a Title IX case). Accordingly, the Court grants judgment on the pleadings in Purdue's favor on the issue of emotional distress damages.

## MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the

absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

### B. Material Facts[1]

*The Duerfahrd-Doe Incidents*

In the Fall of 2016, Duerfahrd was employed as an Associate Professor at Purdue University. (Purdue's Ex. A at 5, ECF No. 194-4). At that time, Doe was a 21-year-old international undergraduate student. *Id.* Among the classes in which Doe was enrolled that semester were one class taught by Duerfahrd and one class that was taught by Duerfahrd's graduate student. (Jane Doe Dep. 62:9-63:19, ECF No. 194-6).

---

[1] Pursuant to Northern District of Indiana Local Rule 56-1(f), Purdue's request to strike portions of the record is embedded in its reply brief. To the extent objected-to portions of Doe's evidence are being used in deciding the summary judgment motion, the Court addresses Purdue's objections below in footnotes 2 and 3. Regarding objected-to statements or pieces of evidence that are not being used to decide this matter, the request to strike is denied as moot.

Doe testified that she met with Duerfahrd off campus on five separate occasions and that she was sexually assaulted by Duerfahrd on the fourth and fifth such occasions. *See id.* 47:11-14 & 48:24-49:5 (first occasion); 66:11-21 & 67:20-22 (second); 68:7-69:20 & 70:2-10 (third); 70:25-71:8 & 81:24-82:16 (fourth); & 157:11-22 (fifth). The fifth occasion occurred in Duerfahrd's office, and Duerfahrd ordered Doe to be there. (Jane Doe Decl. ¶ 46-47, ECF No. 202-1).

At various times, Duerfahrd screamed at Doe, threatened her, and told her to "shut up"; he "exploded with rage" when Doe asked why Duerfahrd was offering Doe wine in a "dark, deserted, unknown off campus location" *Id.* ¶¶ 21, 26-30. On one occasion, Duerfahrd told Doe that she wanted Duerfahrd to rape her. *Id.* ¶ 53. Once, when Doe told Duerfahrd that she was unwell, Duerfahrd responded by asking, "Did the doctor ask you to stop masturbating?" *Id.* ¶ 25.

After these interactions with Duerfahrd, Doe withdrew from classes, and Doe testified that she has been largely unable to resume her studies. *See* (Oliver Dep. 38:13-39:1, ECF No. 194-5) (withdrawal in Fall 2016); Jane Doe Dep. 192:15-195:19 & 289:22:-290:1, ECF No. 194-6 (discussing inability to resume studies)).

Doe reported Duerfahrd and filed a complaint with the U.S. Department of Education's office for Civil Rights and sent a copy to Purdue's Office of Institutional Equity. (Purdue's Ex. E., ECF No. 194-8). An investigation was initiated, and Duerfahrd resigned. (Purdue's Ex. A, ECF No. 194-4 (investigator's report); Purdue's Ex. O, ECF No. 194-18 (letter of resignation)). Doe does not allege Title IX violations regarding Purdue's post-complaint investigation of Doe's claims against Duerfahrd. (Purdue's Ex. P at 2, ECF No. 194-19).

Doe alleges that she has been harmed by Duerfahrd's actions and Purdue's failure to take action prior to Doe's report. She alleges that she has been diagnosed with Post Traumatic Stress Disorder, panic disorder, and agoraphobia due to Duerfahrd's assaults.

4

*Purdue's Anti-Harassment Policies and Procedures*

According to Purdue's Anti-Harassment Policies, the term "Harassment" includes sexual harassment, and is defined as "Conduct towards another person or identifiable group of persons that has the purpose or effect of: Creating an intimidating or hostile educational environment, work environment or environment for participation in a University activity." (Rollock Dep. 69:17-70:1, ECF No. 202-4). Purdue's definition of sexual harassment includes

> Any unwelcome sexual advance, request for sexual favors or other written, verbal or physical conduct of a sexual nature when: . . . Such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance or creating an intimidating, offensive or hostile environment for that individual's employment, education or participation in a University activity.

(Purdue's Ex. L at 30, ECF No. 194-15). The Purdue Anti-Harassment Policies also provided that:

> The University reserves the right to investigate circumstances that may involve Harassment in situations where no complaint, formal or informal, has been filed. In appropriate circumstances, sanctions in accordance with this policy will be implemented.
>
> To determine whether a particular act or course of conduct constitutes Harassment under this policy, the alleged behavior will be evaluated by considering the totality of the particular circumstances, including the nature, frequency, intensity, location, context and duration of the questioned behavior. Although repeated incidents generally create a stronger claim of Harassment, a serious incident, even if isolated, can be sufficient.

(Purdue's Ex. L at 23, ECF No. 194-15). Purdue's Procedures for Resolving Complaints of Discrimination and Harassment provided that:

> The University has an obligation to respond to information of which it becomes aware, whether received directly or indirectly. That is, the University's obligation may be triggered by a direct disclosure by those who have experienced potential discrimination or harassment or by gaining indirect knowledge of such information. For this reason, the University may initiate an investigation of circumstances that involve potential discrimination and/or harassment even where no complaint, formal or informal, has been filed. In those circumstances, the University may elect to investigate and, if warranted, impose disciplinary sanctions pursuant to these or other established University procedures.

(Purdue's Ex. L at 36, ECF No. 194-15).

During the 2015-16 academic year, the Policy included a couple of paragraphs that provided that sanctions for conduct that constitutes harassment, as defined by the policy, would be subject to enhancement when such conduct is motivated by bias based on a person's legally protected status as defined by federal and state law: e.g., race, gender, religion, color, age, national origin or ancestry, genetic information, or disability. (Rollock Dep. 53:11-20, ECF No. 202-4).

Purdue's Title IX Coordinators are responsible for overseeing the investigation and resolution of all reports of sexual harassment involving students, staff, and faculty. (Purdue's Ex. L at 26, ECF No. 194-15). The Office of Institutional Equity (OIE) is the unit at Purdue that handles complaints of alleged sexual harassment, including by conducting formal investigations. (Wright Dep. 43:19-44:5, ECF No. 194-21). On the West Lafayette campus, the position of Title IX Coordinator is held by the Director of the Office of Institutional Equity. (Purdue's Ex. L at 12, ECF No. 194-15). All faculty members are mandatory reporters of all incidents of sexual harassment and must report such incidents directly to the Title IX Coordinator. *Id.* at 28.

The Director of OIE is the decisionmaker on the West Lafayette campus for complaints of alleged misconduct involving a faculty or staff member. (Wright Dep. 16:2-6, ECF No. 194-21). A report to West Lafayette campus OIE constitutes a report to a decisionmaker. (Rollock Dep. 84:21-85:25, ECF No. 194-16). A report must reach the Title IX Coordinator before the university knows of and can act on that report. *Id.* 83:3-84:4. A report can reach the Title IX Coordinator via a report made by a mandatory reporter. *Id.* 84:14-20.

*Previous Reports Involving Duerfahrd*

<u>Previous Report Involving R.P.</u>

In March of 2011, Duerfahrd and a group of students met at a local bar. (R.P. Dep. 17:3-19, 32:16-19, ECF No. 194-22). Sometime thereafter, a subset of this group migrated to a second

bar. *Id.* 19:7-14, 20:9 & 26:12-21. At this second location, graduate student R.P. and Duerfahrd danced with each other. *Id.* 29:15-30:3. Duerfahrd's "hand or arm grazed [R.P.'s] chest" while the two were dancing. *Id.* 29:15-19. After this March 2011 encounter, R.P. continued and completed the course that she was taking with Duerfahrd. *Id.* 33:5-7. R.P. testified that this interaction had no effect on the rest of her semester with Duerfahrd. *Id.* 33:24-34:8.

In the context of explaining that she did not feel comfortable taking another class with Duerfahrd, R.P. disclosed the March 2011 dance floor encounter to Professor Maren Linett in January 2012 and requested that Linett keep the report confidential. (Linett Dep. 12:3-13:20, ECF No. 194-23). Subsequently, Linett submitted an anonymous report of misconduct to Purdue's OIE. *Id.* 19:4-11. At this time, Monica Bloom was the Director of the OIE on the West Lafayette campus. (Peterson Dep. 21:21-22, ECF No. 194-20). Ms. Bloom talked to Nancy Peterson (who was Head of the English Department) and Linett. (Linett Dep. 111:11-20, ECF No. 194-23; Peterson Dep. 21:15-22:12, ECF No. 194-20).

No evidence has been identified to show that Purdue was able to or should have been able to substantiate unwanted touching of R.P. by Duerfahrd or to show that drinking and dancing with students in a social setting violates Purdue policy.

Bloom and Peterson spoke to Duerfahrd and advised that he needed to hold himself to a higher standard of conduct, even if university policy did not govern it. (Peterson Dep. 52:20-53:8, ECF No. 194-20; Duerfahrd Dep. 36:23- 37:5 & 38:14-39:22, ECF No. 194-24).

<u>Previous Report Involving K.H.</u>

On February 8, 2016, while investigating an unrelated matter, OIE received a report that Duerfahrd may have been in a romantic or sexual relationship with student "K.H." (Purdue Ex. V at 1, ECF No. 194-25). On February 11, 2016, OIE followed up by interviewing K.H., who denied

the existence of any such relationship. *Id.* at 2. No further evidence has been identified to show that such a relationship existed.

Previous Reports Regarding Classroom Behavior in 2015

Purdue student G.G. met with Purdue's Director of Graduate Studies, Director of the English Department, investigators, and the Director of OIE in the fall of 2015 to report what she perceived to be sexual harassment by Duerfahrd. (G.G. Decl. ¶ 5, ECF No. 202-8).[2] G.G. discussed the following matters with those individuals:

A. In early fall of 2015, after Duerfahrd had the class watch a film that depicted sexual violence, Duerfahrd asked a female student about the film. The student reported that she was a survivor of sexual assault and was troubled by what she watched, and Duerfahrd responded to the female student that 'If that offended you, then subconsciously you wanted to be one of the girls."

B. After that incident, G.G. stayed after class to discuss a film with Duerfahrd. In the film, there was a large flower sitting on a piano. Duerfahrd asked G.G. if she knew what was better than a flower on a piano, and when she responded that she did not, Duerfahrd replied, "Tulips on an organ." He then chuckled and stated, "Sorry, making a crude joke."

C. Duerfahrd showed a pornographic film to the class and read an autobiography by one of the actors. In the book, the male author writes about hitting a "Puerto Rican" so hard that he knocked her unconscious and a cut to her head that was bleeding. The author then wrote about tending to her wound and then engaging in intercourse with her while she was still unconscious. Duerfahrd asked G.G.'s opinion of the book, and she stated that she did not like the book because of the

---

[2] Purdue objects to the declaration and asks the Court to strike it on the basis that the "G.G." of the affidavit may not be the same "G.G." who complained about Duerfahrd. In Purdue's view, this means that the declaration fails to meet the personal knowledge requirement of Federal Rule of Evidence 602. This objection is overruled, and the Court will not strike the document.

The declarant states that she made the reports at issue in the sworn declaration. As only one individual with initials G.G. has been identified as reporting Duerfahrd to Purdue, there is no reason to suspect any genuine confusion over G.G.'s identity, nor is there any reason to doubt the declarant's statement that she has personal knowledge of the matters addressed in the declaration. "Title 28 U.S.C. § 1746 (declarations) does not prohibit the use of nicknames, aliases, or pseudonyms." *Springer v. I.R.S.*, Nos. S97–0091, S–97–0092, & S–97–0093, 1997 WL 732526 (E.D. Cal. Sept. 12, 1997). A declarant should be "a readily identifiable person who can be subjected to the penalties for perjury." *Id.* The Court has no doubt that this is the case here.

Purdue notes that it has used initials to identify students to comply with its obligations under the Family Educational Rights and Privacy Act (FERPA) and notes that, in contrast, Doe has no obligations to comply with FERPA. It would be of little benefit to G.G., however, if Purdue were to uphold its FERPA obligations only to have Purdue force Doe to disclose G.G.'s identity. *Cf. United States v. West*, No. 08 CR 669, 2010 WL 3951941, at *4 (N.D. Ill. 2010) ("Pseudonyms can be used when a witness's safety must be maintained"); *United States v. Pound*, No. CIV-07-427, 2010 WL 2803918, at *1 (E.D. Okla. Feb. 2, 2010) (approving use of pseudonym by a declarant).

      sexual abuse that was discussed. Duerfahrd belittled G.G. in class, telling her that he wanted to talk about the craft, not the content of the book.

  D. After that incident, the class was given a midterm exam. One of the questions asked something similar to, "You are watching pornography and you are turned on by the acting and not the sex depicted, and you were going to masturbate, describe how that would be."

  E. Duerfahrd made G.G. sit in the front of the class while he showed the class a pornographic film because Duerfahrd stated that he did not feel like G.G. was paying enough attention.

  F. In one class, Duerfahrd continued to joke about how "pussies are hard to train."

*Id.* ¶ 6.

During the meetings with G.G., Purdue employees indicated that they were well-aware of Duerfahrd's harassment of female students, which was an "open secret."[3] *Id.* ¶ 8. G.G. wanted her name to remain confidential until she completed the class to prevent retaliation by Duerfahrd. *Id.* ¶ 7. OIE advised G.G. that they had sufficient information to move forward with action against Duerfahrd and that G.G. did not need to make a formal complaint using her name. *Id.* ¶ 9. G.G. was never advised that any action was taken against Duerfahrd regarding G.G.'s report, and OIE did not request anything further from G.G. after she completed Duerfahrd's class. *Id.* ¶ 10.

Graduate student C.G. met with Jake Amberger, an investigator with OIE, on November 13, 2015. (Purdue's Ex. A, ECF No. 194-4; Wright Dep. 44:14-17, 55:13-16). C.G. reported to Amberger that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. (Wright Dep. 47:1-10). Duerfahrd told C.G. "You're fucking entitled" and left the room. *Id.* 47:5-10. C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching

---

[3] Purdue asserts that the unnamed speaker's statements are hearsay. However, regardless of which of Purdue's employees identified previously as having met with G.G. made this statement, the Court concludes that the statements were on a matter within the scope of the employment relationship during the existence of the relationship. Thus, under Federal Rule of Evidence 801(d)(2)(D), the statements are not hearsay. The Court denies the request to strike this portion of G.G.'s declaration.

pornography and masturbating. *Id.* 47:13-22. C.G. withdrew from the class around September 20, 2015. (Wright Dep. 55:13-22, ECF No. 202-2).

On November 18, 2015, student K.D. submitted a written report identifying her concerns regarding Duerfahrd. (Wright Dep. 35:7-36:3, ECF No. 202-2). She met with Amberger and Associate Director of OIE Erin Oliver about those concerns. *Id*. 35:12-36:3. K.D. reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in his class incredibly uncomfortable. *Id*. 22:7-16. K.D. also provided OIE with a recording of a Duerfahrd class. *Id.* 29:10-24. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy. *Id.* 28:25-29:6.

OIE did not receive formal complaints from K.D., G.G., and C.G., and OIE did not initiate an investigation on its own based upon their allegations despite having authority to do so. (Wright Dep. 37:12-17, 65:14-25, ECF No. 202-2). Instead, the OIE director reached out to Duerfahrd's department head to "explore and address the concerns that were raised." *Id.* 67:7-11.

The head of the English Department testified that she gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id*. 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences he could face if he continued to use inappropriate sexual language in his class. *Id*. 29:23-30:1.

It is "not uncommon" at Purdue, when a faculty member's concerning or unacceptable conduct does not rise to the level of a policy violation, for OIE to reach out to the department head

and the faculty member, sometimes in conjunction with human resources, and to notify the faculty member of their concerns. (Wright Dep. 37:20-38:14, ECF No. 202-2).

Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Previous Report Involving A.S.

Student A.S. met with OIE in September 2016 and reported concerns regarding Duerfahrd. (Wright Dep. 100:8-11, ECF No. 205-5); *see also* (Rep. to Pl.'s Material Facts, ¶ 99, ECF No. 205-1). Amberger's notes from the meeting with A.S. report that A.S. was asked to spit out her gum at Duerfahrd's office hours on September 14th. (Wright Dep. 87:3-22, ECF No. 202-2). The notes continue:

> Put out hand, spit in hand, and put in mouth.
> See how long been chewing, still flavored throughout, I think.
> Continued to talk about a film.
> As leaving, LD said get different flavor next time.
> . . .
> Friday, September 16th, asked to come back to office hours after Wednesday meeting . . .
> Told needed to get out of comfort zone and do things that make her uncomfortable

*Id.* 87:23-88:13. The notes record something about a machine, a strap that was put around A.S. and shook, which A.S. took off and stated she did not want to do anymore. *Id.* 88:14-19 (deponent unable to fully read handwritten notes). A.S. later reported to an individual named Parsons that Duerfahrd had A.S. try out an exercise machine, that A.S. got on for about a minute, felt uncomfortable, and got off. *Id.* 96:1-13.

There was no formal Purdue-initiated investigation following A.S.'s report. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). The department head and a Pam N.[4] spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X.)).

### C. Analysis

Title IX of the Education Amendments of 1972 provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX contains an implied cause of action for private victims of discrimination. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). As a Spending Clause statute, Title IX operates "much in the nature of a contract." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999). ). "In the case of Title IX, the terms are clear: a school district [or university] accepting federal funds promises to not use those funds to discriminate on the basis of sex." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 541 (7th Cir. 2022) (*en banc*) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 292 (1998)). The principles of constructive notice and respondeat superior do not apply; liability only attaches where the educational institution that has accepted federal funds was aware that it was breaking its contractual promise. *Id.*

A plaintiff seeking to hold an institution liable under Title IX must prove two elements to succeed:

> *First*, "an official of the recipient entity with authority to take corrective action to end the discrimination" must have "*actual knowledge* of discrimination in the recipient's programs." *Second*, the official's "response [to that knowledge] must

---
[4] Purdue asserts, without objection from Doe, that this is Human Resources Director Pam Nesbitt.

amount to deliberate indifference to discrimination" reflecting "an official decision by the recipient [entity] not to remedy the violation."

*Id.* (quoting *Gebser*, 524 U.S. at 290) (alterations and emphasis in original). The "actual knowledge" must be of completed or ongoing Title IX violations. *Id.* That is, there is no duty to take corrective action if no Title IX violation has occurred, even if past, non-violative behavior indicates a risk of a future Title IX violation. *Id.* at 541-42.

Once a violation has occurred, then the institution is obligated under Title IX "to act—both to remedy the existing misconduct and to prevent the further foreseeable risks from materializing." *Id.* at 542. The actions taken are not required to "be perfect or even successful." *Id.* at 543. "Owing to Title IX's roots in the Spending Clause, [an institution's] response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *Id.* (citing *Gebser*, 524 U.S. at 290).

Doe agrees with Purdue that Purdue responded properly to Doe's complaint against Duerfahrd. However, she asserts that Purdue responded improperly to previous reports of sexual harassment by Duerfahrd. In this context, Doe must prove that Purdue knew of past discrimination by Duerfahrd and has shown itself to be unwilling to act to put an end to it. *See id.* at 544.

### 1. Notice of Title IX Violations

As a legal matter, Purdue had no duty to act "until it [had] actual knowledge of facts which, in the totality of the circumstances, indicate that sex-based discrimination [had] occurred or [was] occurring under its watch." *C.S.*, 34 F.4th at 544. Accordingly, the Court must determine if Purdue had the requisite knowledge.

13

a.  Fall 2015

Doe asserts that Purdue had knowledge of multiple reports alleging Duerfahrd's sexual harassment of students and that Purdue did nothing to stop the harassment. Specifically, Doe identifies the reports by G.G., C.G., and K.D.

G.G. reported that Duerfahrd showed a film depicting sexual violence and then told a student who disclosed that she was sexual assault survivor "[i]f that offended you, then subconsciously you wanted to be one of the girls." Later, outside of class, Duerfahrd asked G.G. if she knew what was better than a flower on a piano and told her that it was "Tulips on an organ." Duerfahrd then apologized, saying he was "making a crude joke." On a midterm examination, Duerfahrd asked students to describe masturbating to pornography while being "turned on by the acting and not the sex depicted." (G.G. Decl. ¶ 6, ECF No. 202-8).

G.G. declares that she met with OIE staff, the English Department head, and the English Department's director of graduate studies. G.G. further declares that these Purdue employees "made clear that they were well-aware of Prof. Duerfahrd's harassment of female students, representing that it was an 'open secret.'" (G.G. Decl. ¶ 8, ECF No. 202-8).

Another student, C.G., reported that Duerfahrd asked C.G. to come after class, yelled at her, got close to her, and physically intimidated her by blocking her so she could not leave the room. Duerfahrd told C.G. "You're fucking entitled" and left the room. (Wright Dep. 47:5-10). C.G. further reported to Amberger that Duerfahrd had a midterm exam question regarding watching pornography and masturbating. Ultimately, C.G. chose to withdraw from the class.

K.D., a third student, reported that Duerfahrd constantly made sexual or sexist comments in class that made the women in his class incredibly uncomfortable. K.D. also provided OIE with

14

a recording of a Duerfahrd class. Purdue agrees that K.D.'s report included conduct by Duerfahrd that would potentially violate Purdue's sexual harassment policy.

Purdue dismisses G.G's, C.G.'s, and K.D.'s reports as student opinions on "course content, pedagogy, and alleged use of colorful language in the company of adults." (Rep. at 10, ECF No. 205).

When viewed in the light most favorable to Doe, however, the students reported behavior that extends beyond matters of academic freedom, curriculum choices, censorship, and off-color comments and enters the realm of harassment. There is evidence that Duerfahrd (1) told a sexual assault survivor that her discomfort watching a depiction of sexual violence meant that she wished to be subjected to sexual violence, (2) directed a crude, sexual joke to a female student outside of class, (3) on a midterm examination asked students to write descriptions of themselves masturbating, (4) yelled at and physically intimidated a female student outside of class, (5) "constantly" made sexual or sexist comments during class that made female students uncomfortable.

Additionally, Purdue agreed that the report by K.D. included conduct that potentially violated Purdue's sexual harassment policy, and Purdue employees made clear that they were "well-aware" of the "open secret" that was Duerfahrd's harassment of female students.

There is a genuine question of fact regarding whether Purdue had actual knowledge of past discrimination by Duerfahrd during the fall semester of 2015.

   b. Fall 2016

Doe also points to the 2016 report by A.S. that, when the evidence is viewed in the light most favorable to Doe, indicates that Duerfahrd told A.S. during office hours to spit her chewing gum into his hand, which Duerfahrd then placed in his own mouth and began chewing, commented

15

on, and directed her to bring a different flavor "next time." He also had A.S. get on a shaking exercise machine that caused A.S. to feel uncomfortable. This shows a continuation of the pattern of Duerfahrd eschewing a professional manner of relating to female students outside of class and choosing a more intimate and familiar manner.

### 2. Purdue's Response to the Reported Harassment

Once the actual knowledge requirement is met, "Title IX requires [the educational entity] to 'take action to end the harassment or to limit further harassment.'" *C.S.*, 34 F.4th at 547. However, under Title IX, Purdue "will not be held liable unless its response to harassment is clearly unreasonable in light of the circumstances." *Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 911-12 (7th Cir. 2020) (citations and quotation marks omitted). "The response does not have to be perfect or even successful . . . so long as it is not so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *C.S.*, 34 F.4th at 543 (citing *Gebser,* 524 U.S. at 290).

### a. Fall 2015

OIE did not initiate an investigation based upon the reports made in the fall of 2015. Instead, the OIE director reached out to Duerfahrd's department head to "explore and address the concerns that were raised." (Wright Dep. 67:7-11, ECF No. 202-2). According to testimony given on behalf of Purdue, the English Department head gave Duerfahrd expectations of how he was to behave in the future related to the use of inappropriate sexual terms in his class. (Ratcliffe Dep. 29:23-30:6, ECF No. 205-3). She explained that she thought there was a difference between critical engagement and making students feel uncomfortable in a way that created a hostile environment. *Id*. 30:15-19. The English Department head does not remember Duerfahrd being informed of any consequences if he continued to use inappropriate sexual language in his class. *Id*. 29:23-30:1.

However, Duerfahrd testified that he did not recall speaking to anyone from Purdue in 2015 regarding any student complaints against him. (Duerfahrd Dep. 49:20-23, ECF No. 202-5). He further stated that, prior to Jane Doe's complaint, no one at Purdue admonished him or cautioned him regarding his interactions with students, other than the R.P. dancing incident and an incident regarding a film Duerfahrd showed in class in 2009. *Id.* 48:19-49:11, 50:2-9.

Given the conflicting evidence regarding how Purdue responded to the prior reports, there is a genuine issue of material fact, so Doe withstands summary judgment on the issue of whether Purdue was deliberately indifferent to discrimination.

      b.      Fall 2016

There was no formal Purdue-initiated investigation following A.S.'s report in 2016. *See* (Rep. to Pl.'s Material Facts, ¶ 106, ECF No. 205-1). Notes recorded by Amberger regarding the situation state that the department head and Pam Nesbitt spoke with Duerfahrd about unspecified matters, and the notes report that Duerfahrd "said he would never use 'c word' in class or other terms like that" and "he did say like to take students out of their comfort zone." (Purdue Ex. X, ECF No. 205-4; Wright Dep. 96:14-97:3, ECF No. 205-5 (identifying Ex. X)).

However, once again there is a genuine issue of fact. Duerfahrd testified that, after the dancing incident with R.P, no one at Purdue admonished or cautioned him about his interactions with his students. Accordingly, questions of fact preclude a finding at this stage that Purdue's actions were not "clearly unreasonable."

      3.      *Foreseeability of Risk to Jane Doe*

Purdue's final argument is that any past misconduct by Duerfahrd was insufficient to alert Purdue to the possibility that Duerfahrd would become sexually involved with a student. In *Gebser*, as Purdue identifies, a single complaint that a teacher had used inappropriate comments

17

during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291.

*Gebser* is not directly on point here. Though Doe does allege that she was an unwilling recipient of Duerfahrd's sexual actions, there were more complaints against Duerfahrd than there were against the teacher in *Gebser*. Furthermore, Doe alleges milder forms of sexual harassment in addition to the sexual assaults. The Court cannot only consider whether the most egregious misconduct was foreseeable. Purdue can be liable under Title IX for lesser—but still violative—misconduct.

Doe has presented evidence that connects Duerfahrd's past behavior to instances of misconduct perpetrated against her. Similar to the midterm examination question—reported at least twice to Purdue—that asked students to describe their own masturbation, Duerfahrd asked Doe: "Did the doctor ask you to stop masturbating?" (Doe Decl. ¶ 25, ECF No. 201-1). Duerfahrd told Doe that she wanted to be raped; Purdue knew that he had previously told a sexual violence survivor that discomfort with depictions of sexual violence meant that the survivor wished to have more sexual violence inflicted on her. Duerfahrd exhibited intimidating behavior in a private setting toward Doe as he had toward C.G. Duerfahrd used his office hours as an opportunity to misconduct himself with Doe, as he had with A.S. (chewing her gum and having A.S. get on an exercise machine that made her uncomfortable). The Court need not reach the closer question of whether Duerfahrd's sexual acts on Doe were foreseeable because, at the very least, a reasonable jury could find that his milder (but still harassing) behaviors were.

In light of Duerfahrd's continuation of behaviors for which there is evidence that Purdue took no action to curb (despite there being an "open secret" that Duerfahrd harassed his female students) and the reality that "[p]ast misconduct may foreshadow even worse future misconduct,"

*C.S.*, 34 F.4th at 542, the Court finds that a reasonable juror could determine that Doe was subjected to sexual harassment in violation of Title IX because Purdue did not act to prevent the further foreseeable risks from materializing after having actual knowledge of Duerfahrd's prior misconduct. Purdue's motion for summary judgment fails.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Defendant The Trustees of Purdue University's Motion for Judgment on the Pleadings [DE 192] and **DISMISSES** all claims for emotional damages brought by Plaintiff Jane Doe against Defendant Purdue University. The Court **DENIES** Defendant The Trustees of Purdue University's Motion for Summary Judgment [DE 194].

SO ORDERED on November 28, 2022.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT